HOLSCHBACH, Respondent, v. HOLSCHBACH, Appellant.

St. Louis Court of Appeals, November 17, 1908.

1. DIVORCE: Indignities. In an action for divorce by the wife, evidence that plaintiff and defendant frequently quarreled, that the defendant was ill-tempered and harsh, faultfinding, neglectful of his wife and overbearing in his treatment of her, and often spent his evenings away from home, did not constitute statutory indignities justifying a decree, where it was shown that the wife was also ill-tempered, hard to get along with and was equally as quarrelsome as the husband.

2. ———: ———. And in such action, where on trial of the husband's cross-bill, it was shown that the wife was unreasonably jealous of the defendant's family, called him names, refused to go out with him and frequently quarreled with him, this did not suffice to constitute statutory indignities justifying a decree in his favor.

Appeal from St. Louis City Circuit Court.—*Hon. Wm. M. Kinsey*, Judge.

Holschbach v. Holschbach.

REVERSED AND DISMISSED.

*Judson & Green* and *Edw. V. P. Schneiderhahn* for appellant.

*J. Hugo Grimm* for respondent.

GOODE, J.—These parties were married November 4, 1902, and separated finally some time in April, 1907. There had been a previous separation which continued for six months, when a divorce suit was filed by defendant against his wife. Through the influence of plaintiff's cousin, the parties became reconciled and resumed conjugal relations. This is the second suit for divorce and was begun by the wife. The parties resided after their marriage with plaintiff's widowed mother and her family on Shenandoah avenue, until January, 1904. On October 4, 1903, a few months before they left that home, their only child Viola, was born. The husband and wife and their families appear to have gotten along well until after the child was born, when dissensions crept in. Plaintiff and her family are Protestants and defendant and his family Catholics; wherefore plaintiff signed a writing before the marriage in which she recited her intention to marry defendant, knowing he was a member of the Roman Catholic Church; said she would do so understanding the marriage bond was indissoluble, except by death; would permit defendant the free exercise of religion according to the Roman Catholic faith, and permit any children born of the marriage to be baptized and educated in the faith and according to the teachings of said church. There are signs in the record that the diverse religious opinions of the parties were a principal source of their bickerings and of the estrangement of their families, who became bitter toward each other. But disagreements about religion did not cause the departure of the parties

.from the home of plaintiff's mother, nor were they the sole cause of the hostility that exists between the family and defendant. While plaintiff was pregnant and especially after the child came, her mother, Mrs. Kreibohm, felt the burden of the household severely, as plaintiff could not assist her, and finally a quarrel broke out between defendant and plaintiff's brother over this matter; whereupon defendant moved to apartments on Rutger street. His wife was reluctant to accompany him, but after two weeks she went to the Rutger flat. A good deal is said in the evidence about the bad odors of a nearby livery stable, and a sewer; but in view of the fact that plaintiff did not leave the flat because it was a disagreeable place, this evidence is of slight importance, and, moreover, the main witness for plaintiff (Dr. Fuchs) said the rooms were not unsanitary, but lacked conveniences. Quarrels occurred between the wife and husband, occasioned, it seems, by his staying away from home until late in the evening and taking his luncheon, and, on three evenings of the week, his supper, at his mother's home; wherein he kept an office and practiced his profession of dentistry. Plaintiff thought, too, her husband paid his mother too much money for office rent in comparison with his allowance to her. Defendant's dental office was on the first floor of his mother's home, and she and her family occupied the upper story. He paid forty dollars a month for the house and paid for the lighting, allowing his mother ten dollars a month and the use of the upper story for taking care of his office and giving him such meals as he wished to take with her. Plaintiff became jealous of a married woman, whom she found on one occasion in his office, and this contributed to produce discord. Defendant justified his absence from home because, as he swore, his practice was for persons who were busy through the working hours of the week days, and, in order to hold his patients, he had to treat them on Sun-

day and in the evenings. It is conceded there was no ground for plaintiff's jealousy of the woman in question; though it persisted more or less. Other complaints are that defendant did not take plaintiff riding with him or to the theatre. She admitted on the stand he asked her to go driving and she refused because he used his brother's horse, insisting he should buy a horse to use in a buggy he owned. The evidence does not show he was in the habit of going to amusements without her. These matters are rather petty and we consider them of trivial importance, because, whatever their merit, they were condoned by plaintiff, as her previous errors were condoned by defendant by the reconciliation after the first separation. She testified she left defendant the first time because he requested her to do so and said he would no longer pay rent for the Rutger street apartments; whereas he says she constantly threatened to go home, called him names and abused him, was so annoying he could not attend to his business, and at last he told her she had better go home as they were not able to get along. He swore she called him a dog, hound, cur and other offensive epithets, and declared she would have no other child by him; and in these matters he was corroborated by other witnesses. The expressions she used with reference to having children, as related by him, are too vile to be printed. The other witnesses testified to her declarations that she would not bear any more children, but no one else repeated obscene language used by her; and, indeed, according to his testimony, what he related was spoken in private. After plaintiff went to her mother's in May, 1904, defendant instituted an action for divorce. While this action was pending, the parties met accidentally at the office of Dr. Fuchs, a cousin of plaintiff's, and he brought them together for a settlement of their troubles. He had attended her when the child was born, following which event she fell into low spirits and extreme nervousness.

Dr. Fuchs attributed her condition to worry over defendant's imaginary relations with the woman mentioned, and his absence from home so much at night. At this interview between the parties, defendant said he thought it best to move away from her mother's home, in which opinion the Doctor coincided. Plaintiff wanted to move into the rooms over defendant's office; Dr. Fuchs thought because of jealousy, and perhaps so she could have more of his company. According to the Doctor, defendant showed a bad attitude regarding his domestic relations, and said, in substance, he would have his way about certain family matters that were in dispute, if he broke his neck in getting it. We give great weight to what occurred in Dr. Fuch's office, and particularly to the doctor's testimony; for he was a fair and intelligent witness. At this meeting plaintiff and defendant stated to each other specifically the conditions on which they would resume married life, agreeing the Rutger street apartments were not in keeping with defendant's standing as a prominent dentist, and it seems to have been decided to procure another home soon. Defendant said if plaintiff would move back to the neighborhood he would try to get home every day to dinner, or at least three or four times a week. Plaintiff promised not to bother him about his relations with his patients or interfere with his work in any way. These stipulations of the parties do not indicate the existence of serious grievances prior to the first separation, but that the bad feeling had grown out of trifling differences. Although plaintiff and defendant went together again, their families continued to be estranged and even hostile, thereby diminishing the likelihood of permanent concord between husband and wife. After their reunion, which occurred about November, 1904, they lived in the Rutger street apartments until the second separation in April, 1907. Plaintiff says she wanted to

move somewhere else, and defendant says he offered to rent other apartments, but she would not move. They got along as they had before and quarreled over the same causes. Just after the reconciliation they agreed their child Viola, should be taken on alternate Sundays to plaintiff's mother's home, and on the other Sundays to defendant's mother's home; and this arrangement was adhered to, but reluctantly on plaintiff's part. She continued to grow dissatisfied with it, and on Easter Sunday, 1907, while the child was at defendant's mother's, went there in the morning to get it. She found defendant's brother in the dental office and after a violent quarrel with him, started upstairs to get the child, but was refused permission to do so, and it remained there until evening, when defendant took it home. This incident was the immediate cause of the second separation, and a careful study of the voluminous record has failed to reveal any secondary cause for it, except latent discord and ill-will between the parties. Defendant was preoccupied with his practice and plaintiff dissatisfied with the tenor of her life. Plaintiff herself testified she left defendant because of his refusal to let her take the child the day mentioned, and because she could not bear for it to go to his mother's any longer. Her testimony is as follows:

"Q. I don't know whether you were asked or not, but I want to ask you, what was the immediate cause of your leaving home at that time? A. Well, because he refused to give me that child that day, and ordered me out and never spoke to me any more and it was almost impossible for me to put up with it.

"Q. Was that the Easter day that he wanted the child? A. Yes, sir.

"Q. And two weeks after that day you went down there and tried to get the child? A. Yes, sir.

"Q. That was one thing; what was the other? A. Why, then because he refused to give me the child

when I went down there I told him I didn't feel that I would like to have the child go down there any more; that his folks could visit her, and I did not feel that it was right to let the child go there Sundays any more, and he insisted on it, and said that she should go down there whenever he wanted, and I felt that I couldn't stand it any longer.

"Q. You left and took the child with you? A. Yes, sir.

"Q. The incident you have related was on Easter day, and the subsequent conversation you had with him in which you said you would not allow him to have the child any more is the time following it, and his statement to you that he would have it so was what brought you to the conclusion that you would go home and take the child with you? A. Yes, sir.

"Q. Perhaps it is already in the testimony, but I will ask you again, when was the arrangement first made by which he was to take the baby on one Sunday, and you were to have it the next? A. Well, right after we were reconciled, for two years and a half he had been doing that. . . .

"Q. You took the child to your mother's every other Sunday? A. Yes, sir; I never went out in the week.

"Q. Were you willing that he should take the child down to see his mother? A. I was not willing; but he wanted to have it that way, she was so awfully small at first; just a little over a year old, and I had to fix the bottle for her, and her napkins and everything.

"Q. Did he ever ask you to go down with him with the child? A. No, sir, never. I often tried to be reconciled to his folks, and wanted them at Christmas, but he said, no."

Plaintiff did not leave home until two weeks later, when she returned to her mother, taking her clothing and household property, and without notifying defend-

ant she intended to leave. Such, in substance, is an account of the difficulties between these two parties, epitomized from the evidence as fairly as we can present it, but without giving a sense of the perverse obstinacy of both parties and their unwillingness to bear with each other and make reasonable concessions for the sake of concord, which pervades the entire evidence. Defendant's manner of testifying leaves the impression that he held high notions regarding his rights as head of the family and did not sufficiently consider in many ways his wife's wishes, or that a woman's tastes and pleasures differ from a man's; whereas she hated his people, was incensed by his intimacy with them, resented their claim on the child, was unwilling to make allowance for the demands of his practice on his time, and was causelessly jealous. Nothing appears against the character of either party, but both are industrious and well-behaved persons and enjoy the good opinion of their neighbors.

The causes for a decree which plaintiff states in her petition are these: Defendant compelled her to return to her mother in May, 1904, and, without grounds, filed a suit wherein he accused her of subjecting him to intolerable indignities; that he sought a reconciliation, and relying on his assurance of giving her proper attention and affection, she returned to him, but since then he had treated her with coldness and contempt; has taken his midday meals and on three days of each week, his evening meals, at his mother's, has returned home late in the other evenings and required plaintiff to prepare meals for him; stayed from home on Sundays, saying he was at work, though frequently he was out driving with different persons; persisted in taking the child from home on alternate Sundays, keeping it late and leaving plaintiff alone; rarely took plaintiff to places of amusement; though receiving an income of from three to five hundred dollars a month, refused to

provide domestic help; required plaintiff to carry coal to their second-story rooms, do all the work and live in an unsanitary dwelling; has refused to provide sufficient means for household expenses; gave plaintiff money in petty sums and only when asked; insisted on her keeping an account of the expenses and found fault with the manner in which she kept it, was surly, fault-finding and taciturn to plaintiff, but friendly to others and on his evenings at home visited the neighbors and left plaintiff alone.

We have indicated how the evidence touching those complaints impresses us. Plaintiff condoned whatever grievances she had prior to the first separation, though, to be sure, they would be revived if repeated; for, according to her, the condonation was based on his promise of better treatment. But neither before nor after the reconciliation do we find such acts as constitute statutory indignities which rendered plaintiff's life intolerable, and, in reason, would be expected to do so. Plaintiff had cause to complain of defendant's staying away from home too much in the evening and on Sunday, if she really desired his company. He excused this conduct on the score of keen business competition and the class of patrons he had; working people who could not visit his office at other times. We are satisfied these circumstances, and not dislike of his home, were the true reasons why defendant put in so much time at his office. A court cannot say how a man who must depend on his business to support his family and accumulate a competency, shall divide his time between his home and his affairs. A wife's complaint in respect of this matter cannot be treated as a statutory indignity, unless the neglect of the husband amounted to desertion or he displayed contempt or aversion for her, or, perchance, his neglect of her was so extreme as to constitute cruelty and prey on her health and spirits. Though defendant probably devoted more time to his

business than was necessary, or consistent with proper interest in his wife and concern for her feelings, it would exact a standard of connubial harmony higher than the statutes warrant, or than is compatible with maintenance of the marriage tie in reasonable security and strength, to allow plaintiff a divorce for this cause on the facts in proof. Said charge and the charges that defendant spent his evenings when at home with the neighbors, and that he refused to take plaintiff driving or to amusements, we consider are not sustained. Plaintiff was as much at fault for the facts on which those accusations are based, as defendant. He offered to take her driving and she refused to go from a paltry motive which arose either out of vanity or dislike of his people. He took her to the theatres sometimes and offered to do so oftener, but she refused his invitations. That the rooms where they lived were not unsanitary, was proved, as we have stated, by plaintiff's own witness, who was also her cousin and friendly to her, and the person best qualified to pass on the question. We think there is not much substance in defendant's alleged surliness toward plaintiff and preference for the society of others in the evening. Sometimes in the summer evenings he would go downstairs and talk with neighbors who appear to have used the same yard, while his wife remained upstairs; but such incidents are common in households, seems not to have gone to an extreme in the present case, and the testimony tends to prove were due as much to her unwillingness to join him in paying a visit, as to his wish for other company. Neither was his manner and language toward plaintiff more offensive than hers toward him; for we accept as proved the charge that she called him disgraceful names. Such epithets, her proved statements that she would not bear him children, causeless jealousy and refusal to accompany him on drives, were acts illy adapted to bring sunny moods or affable demeanor. She oc-

casionally carried coal upstairs, and he did, too. At first she had no domestic help but later had a woman to do the scrubbing and cleaning. Defendant provided for his family, and though the sums of money given to plaintiff were small, there was no considerable trouble on this score, and plaintiff did not suffer for lack of reasonable necessities. There is nothing substantial in all these complaints and they do not present a true picture of the life of the couple; but, as in most divorce cases, are collected from the general course of life during years and thrown together in the testimony of a few hours, as if they composed the entire marital history. Plaintiff's own statements prove they did not immediately cause the separation. At bottom this was due to the estrangement of the two families and their influence on these parties, who leaned too much toward their relatives and were exacting and contrary with each other. A particular source of difference was that plaintiff so disliked defendant's people as to begrudge them the child on alternate Sundays, after she had agreed they might have it. We cannot assent to the decree for plaintiff, both because we believe she has been as much to blame for the domestic troubles as defendant, and because she has not established a statutory indignity according to the exposition of the statutes by our appellate decisions. Wrangling due to lack of conciliatory, temper in both parties, is not an indignity. [Webb v. Webb, 44 Mo. App. 229; Griesedieck v. Griesedieck, 56 Mo. App. 94.] For an indignity to be intolerable in the statutory sense, it must amount to a species of mental cruelty. [Goodman v. Goodman, 80 Mo. App. 274.] We find nothing in defendant's conduct which justly can be so described; for, though on the witness stand he displayed bigotry regarding his authority as husband, none of his offensive conduct toward plaintiff was either in form or frequency of a kind to be classed

as cruelty, physical or mental. For the marital relation to endure amidst the cares of life, with their irritating effects on nerves and temper, reasonable forgiveness must be practiced and a conciliatory spirit cultivated. Disagreements and even grievances occur between good men and good women who, by practicing forbearance will, on the whole get along well together. This is the spirit of the law regarding divorce. [Webb v. Webb, supra.]

Turning to defendant's cross-bill we find these matters averred: intolerable indignities committed by plaintiff prior to the first separation, leading defendant to file a suit for divorce; reconciliation for the sake of the child, on defendant's promise to treat plaintiff with kindness and affection if he would live with her again; abandonment of him without cause in April, 1907, and institution of the present suit; annoyances heaped on him by plaintiff and consisting of continual quarreling and fault-finding, calling him a dirty dog, contemptible coward and other vile names; trying to teach his child to hate him; unreasonable jealousy of his mother and sisters and breach of friendship with them because defendant paid his mother's rent; objections to the child visiting defendant's relatives; efforts to provoke him to strike plaintiff in order that she might have ground for divorce; refusal to go driving or to amusements with him and anger if he went with his brothers or sisters; objecting to the baptism of the child into the Catholic Church according to the antenuptial agreement, and refusal to have natural intercourse with defendant lest she might conceive. It will be observed defendant counts neither on desertion for more than a year, nor on the vile language previously mentioned, in which, as defendant swore, plaintiff declared her intention not to bear children. Some of the grounds alleged in the cross-bill are statutory indignities; other are not. Jealousy of defendant's fam-

ily, calling him names, refusing to drive and attend
theatres with him, and fault-finding, would not suffice
unless carried far. [Cannon v. Cannon, 17 Mo. App.
390; Webb v. Webb, 44 Mo. App. 229; Kempf v. Kempf,
34 Mo. 211.] Some of the charges were not proved;
*i. e.*, that plaintiff objected to the child being baptized
a Catholic, to which, in truth, she consented and the
baptism occurred. She only objected to it taking place
before she was well over her confinement and could
attend. Remarks to the child adapted to engender
hatred toward his father and intended for that pur-
pose, if persisted in as a settled policy and not uttered
in occasional outbreaks of anger, would be a serious
and intolerable wrong, but this conduct was not estab-
lished. Neither do we believe the denial of intercourse
was. The tone of defendant's testimony, as well as the
testimony of other witnesses, has convinced us he was
too highheaded and arbitrary to be held innocent in
respect of the disagreements between himself and wife,
and we will not disregard the findings of the court
below to the extent of granting him a decree. We hold
neither party has made out a case of faithful demeanor
and intolerable indignities within the intention of the
statutes; by which we must be governed, of course, even
though there is little promise that the parties will be
able to get along with reasonable harmony as husband
and wife.

The judgment is reversed and the petition of plain-
tiff and defendant's cross-bill are dismissed. All con-
cur.