[1] This is a divorce suit brought by Margaret Powers Greenbury against Francis E. Greenbury. The trial resulted in a finding in favor of the defendant and a dismissal of plaintiff's petition. From the judgment of dismissal plaintiff appealed.
[2] The petition for divorce is based upon the following alleged indignities charged by plaintiff to have been offered her by defendant, and which she claimed rendered her condition in life intolerable:
[3] That defendant nagged at plaintiff, and the two minor children born of the marriage, over trifling occurrences and trivial matters;
[4] The defendant was cross, fault finding, critical, and complaining toward plaintiff, and exacting and unreasonable in his demands upon plaintiff and said children, causing the family to be in constant turmoil, and causing the children to shun him in order to avoid unpleasantness and continual nagging;
[5] That defendant was miserly and neglected to provide adequately for the support of plaintiff and said children, and refused to discuss such matters with plaintiff;
[6] That defendant told plaintiff she must support herself, and forced plaintiff to provide for her own support most of the time during the period of their marriage;
[7] That although plaintiff called defendant's attention to the fact that the family was in need of household necessities, such as sheets, window curtains and other articles, defendant refused to provide plaintiff with the means to supply them;
[8] That defendant was unreasonably harsh in his treatment of the children; that he sought to subject them to his complete unbending will and domination, and put them in fear of their personal security by informing them that he was going to sell their home and put them out, with the result that the children did not have normal visits of friends at their home, but were forced to have their friends there during defendant's absence; and
[9] That when plaintiff was pregnant, defendant on two occasions attempted to forcibly administer drugs to plaintiff for the purpose of causing an abortion.
[10] The parties were married November 17, 1928, and immediately thereafter made their home at 1514 McCausland Avenue in the City of St. Louis. At that time defendant was employed at Bemis Bro. Bag Company and continued working for said company for three years thereafter. From 1932 until 1938 defendant was not regularly employed. In 1938 he secured employment in the mechanical department of the Wagner Electric Company as a tool designer, and has since continued in that position. He was so employed at the time of the trial below.
[11] During the late economic depression defendant took whatever employment he could secure, and there were long periods that he was unemployed. Plaintiff, by her testimony, sought to leave the impression that defendant did not take advantage of all opportunities to secure employment during that time. She testified that "he preferred to wait for a job suited to his abilities." We are not convinced that her conclusion in this respect is true. The evidence shows that during this period defendant secured work at a number of places and continued on them as long as the jobs would last. At one time during this period he worked for the Bureau of Homeless Men as a junior social worker, his duties being to interview men, handle the mass feeding of the men at noontime, and keep books. He did this work for over a year. Defendant also held various small government jobs, more or less in the line of engineering in connection with a housing project in north St. Louis and a housing project in south St. Louis. For a short time in the spring of 1932 defendant worked for the St. Louis County Gas Company.
[12] From defendant's testimony it appears that there were times, perhaps a month or two months at a time, when defendant would be unemployed, and that during the *Page 155 
time he was employed he did not make enough to meet the expenses of the family during the periods of unemployment, with the result that defendant at said times would be compelled to borrow on his life insurance. During these times plaintiff also sought employment. The child Nancy was born March 3, 1930, and a few months prior to that event plaintiff worked on the Gallop Poll, interviewing people and collecting statistics. She also did art work and exhibited same. Plaintiff also substituted as a teacher in schools, and worked as a saleswoman. In this latter capacity she sold dresses from door to door, but was compelled to quit this job on account of ill health. Later, however, she secured a position with the F. E. R. A. Plaintiff stated that at the time she made application for relief they had no money and that the only food in their house was one-half cup of corn meal and one-half cup of sugar. About a week after making said application plaintiff received a relief check and thereafter continued to receive them regularly until she was given the job she had applied for. She was given a job as Recreational Director and assigned to the Y. M. H. A. at Union Boulevard and Enright Avenue in the City of St. Louis. She held that position for several months during which time defendant, being unemployed, did the housework and some of the cooking, but contributed nothing to the household expenses. Plaintiff complained that defendant, during this time, prepared too expensive meals.
[13] Plaintiff wrote a book entitled "A Book of Little Crafts." This book, published in 1943, dealt with simple and inexpensive crafts that could be engaged in at home, and was designed for children. Plaintiff's royalties on this book have amounted to about $800. Plaintiff also wrote a second book, entitled "The Party Table," designed for adults. On this last mentioned book plaintiff received royalties in the early part of 1947 in the sum of $329.40. Plaintiff has also contributed to juvenile magazines and has held a good many jobs in recreational work. Plaintiff has at times taught classes at the Y. M. H. A. and at the Y. M. C. A., both in downtown St. Louis and at Webster Groves, Missouri, and at the Council House in Wellston. She has also taught at the Jewish Sanatorium located on the Fee Fee Road in St. Louis County, and was so engaged at the time of the trial below. At this place she taught three days a week for a period of four hours each day. She stated that she was being paid $65 per month for this work and was going to receive a fifty per cent. increase. She also testified that at the time of the trial she was teaching crafts at the Y. M. H. A., a regular class paying her $4 a session, and two other classes that were not regular.
[14] Between the time Mr. Greenbury lost his job at Bemis Bro. Bag Company in 1932, and the time he went to work at Wagner Electric Company in 1938, the family lived in a number of places, a part of the time at the home of Mrs. Greenbury's parents, and a part of the time at Mr. Greenbury's parents. It also appears that for some time Mr. Greenbury lived at the home of his parents while Mrs. Greenbury lived at the home of her parents or in boarding houses. Defendant provided for plaintiff's support while she lived in boarding houses. For about a year the children, Nancy and Richard, lived at an orphan's home. Defendant testified that he did not want his wife to send the children to the orphans' home, but he was out of a job and could not pay rent. Defendant finally got something to do and rented a room. Thereafter the family went from rooming house to rooming house; then, in 1936, they moved to Maplewood. They lived in Maplewood until December, 1941, at which time defendant purchased a house in Webster Groves. The purchase price of the house was $4,200, and the down payment $800. At the time of the trial there was due on the purchase price of the house a sum in excess of $700. The monthly payment on the purchase price of the house is $31.95, which amount takes care of interest payments and insurance, and reduces the principal amount due.
[15] In 1940 defendant began to work overtime at his job at the Wagner Electric Company, and continued to do so through the year 1945. During that time defendant worked ten hours each day, except *Page 156 
Saturday and Sunday. On Saturday he worked eight hours, and on Sunday seven hours. He would leave home about 7:30 o'clock in the morning and arrive home at night at about 9:00 p. m. At the present time defendant's base pay is $323 per month before deductions. He usually works overtime three or four hours on Saturdays. He testified at the trial that his pay check, which he receives every two weeks, amounts to about $179.
[16] Plaintiff testified that before defendant started to work for the Wagner Electric Company she provided food for the family for $3 per week. Defendant testified that he knew of no time when the budget for groceries amounted to $3 per week. According to plaintiff's testimony the budget for groceries was increased to $5 per week for a number of weeks after defendant went to work for Wagner Electric Company, and later to $8 per week. She stated that during that time defendant complained about the food, and wanted steaks and roasts, when the budget only permitted her to serve the family stew perhaps once a week. She stated she had to plead with defendant every time she wanted a cent — even for an emergency. Plaintiff testified that during the last two or three years the budget for groceries was fixed at $20 per week. Defendant testified that the amount expended for groceries usually ran to $25 per week; that he had his lunches out, but that plaintiff occasionally prepared them for him, and that occasionally the family ate out.
[17] Plaintiff testified that beginning with the first week she and defendant were married, defendant started nagging her about her cooking, although he knew when he married plaintiff that she could not cook. This, according to plaintiff's testimony, occurred at every meal. She stated that defendant displayed a violent temper, and that the tone of his voice was loud; that practically every day when he would come home from work he would attack any one who happened to be there; that if it was the dog, it got kicked; if it was one of the children, the child was screamed at; or if plaintiff happened to be the one present, he would yell at her.
[18] Defendant denied that he nagged at his wife, but stated he did complain to her during the last two years about the condition of the house, stating that he would come home at night and find the dishes not washed, the beds not made, and things not put away; that it was plaintiff's practice to leave these things for the children to do, but they rebelled and would not do them.
[19] Plaintiff testified that defendant complained when he learned she was pregnant the second time and said it was her fault, and that she was committing a crime against him. She said that he objected to the expense, and on two occasions attempted to force her to take medicine for the purpose of producing an abortion. She further stated that the first time he made such attempt she swallowed the medicine, but on the second occasion she had the moral strength to resist. On cross-examination plaintiff testified that the occurrence took place at the home of defendant's mother and that there were a houseful of people living there, including some roomers. She stated that the medicine was some drug which he attempted to force her to swallow. She said she saw the medicine, but did not remember what it looked like. She could not remember whether it was a liquid or powder, but that it was in a bottle. On re-direct examination she stated that the room where this occurrence took place was in the rear of the house, on the first floor, and that no one was in that part of the house at the time. She further stated that defendant told her he had consulted a physician who had advised him it was the thing to do and that he was determined to get results.
[20] Defendant denied having attempted to force an abortion upon his wife, or having asked her to take any medicine to accomplish that result. This occurrence, if it happened, took place prior to the birth of their son, Richard. Richard was born in 1932.
[21] In her testimony plaintiff complained of defendant's refusal to fix up their house in Webster Groves. She stated that they had lived there three years before defendant painted a single room. There was *Page 157 
introduced in evidence a photograph of the room occupied by the child Nancy, showing wallpaper cracked and hanging down in an area about three feet square. Also a photograph of the linoleum in the bathroom, showing it cracked and rolled up in numerous places. Also a photograph of the dining room rug showing it frayed in a place about one foot long and one-half foot wide.
[22] The defendant's evidence shows that from 1940, through 1946, defendant worked overtime and would leave home around 7:30 o'clock in the morning and arrived home in the evening about 9:00 p. m. On Saturdays he worked eight hours and on Sundays seven hours. Defendant testified that after the family moved to Webster Groves the first thing he did was to clean the house and yard. He stated that he had to clean the whole house from attic to basement, and that it took all the first summer to do that. He further testified that each summer he tried to do something in connection with the house, and at the time plaintiff filed suit he had painted the exterior of the house, the dining room, together with the hallway leading to the second floor.
[23] According to plaintiff's testimony her husband painted the exterior of the house during his vacation two years prior to the trial. She also stated that he had painted the front hall and the woodwork in the house, and three rooms.
[24] The painting of the living room caused a great deal of stress and strain. Plaintiff testified that defendant painted it until she was driven frantic; that she thought he would never get through. She also claimed that defendant insisted on putting on a certain color in spite of anything she would say, insisting that the color he was using was what she wanted. She further testified that she would not give in, and eventually got her way after defendant had put on several coats of paint. Plaintiff testified that she did not know whether it was a quarrel, but she got desperate and would pace the floor "to let off steam." She further stated that defendant got desperate also, and that he also yelled, but that she did not think her conduct caused him to become desperate. The painting of the living room was finally completed. Plaintiff testified it was the right color and that she liked it.
[25] Plaintiff also complains that defendant refused to buy a new rug for the living room, and new slip covers for the furniture in the living room. She stated that when she would ask defendant to provide these he would get angry and say things that had no relation to the subject, and would frequently tell her to wait.
[26] Plaintiff further testified that when they moved to the Webster Groves house she had to put up rags for window curtains, both upstairs and downstairs. Two years before the trial she purchased some new curtains for some of the windows, and half curtains for the windows in the kitchen and bathroom.
[27] Plaintiff further stated that the furnishings were in very poor condition and that the linoleum in the kitchen had two dangerous holes in it. She stated that defendant had refused to buy her new linoleum, telling her each time she asked for it to wait. She stated that there were holes in the rugs which she would cover by placing the furniture over them, and that defendant would object to this and move the furniture to suit himself.
[28] Plaintiff further testified that the floors in the house are in such condition that the dirt catches in the cracks, and so rough that the mop catches, and that defendant has told her she will have to wait for that condition to be remedied.
[29] Mrs. Greenbury testified that on numerous occasions her husband struck her, and that on a number of these occasions he did so with so much force that he knocked her down. When asked if she ever gave her husband any cause for striking her, she replied that she might have been cross. She was also asked if at the time he struck her she had struck him with anything, and she replied: "It is possible I had slapped him with my hand, but I don't slap hard. Sometimes when his words became too unpleasant I have slapped him in the mouth." Plaintiff further testified that defendant *Page 158 
had been striking her since early in their married life, and off and on during the last year. She stated that a good many times others were present when he would strike her, and that on one occasion he struck her in the presence of her parents. She further testified that she did not remember what were the provocations of his striking her. She stated that he would get so violently angry that frequently she did not know what he was arguing about; that he would get angry without provocation.
[30] Further testifying, plaintiff stated that she had slapped her husband two or three times, but that it had been several years since she last slapped him. She explained this ability to control herself as follows: "It has been several years. * * * because before he used to be able to irritate me, but now I have reached the point where I had enough money to go to a doctor and get my nerves treated and that has helped to get them under control, and then I am able to keep calm no matter how violent he would get."
[31] When asked by his attorney if he ever struck his wife, defendant replied: "No, I have never struck my wife. I pushed her away from me at times." He further testified that on one occasion his wife hit him with a bowl and he had to push her away. He also stated that his wife had slapped him at times, but that she was not in the habit of doing that.
[32] Plaintiff denied she ever struck defendant with a bowl, but stated she might have kicked him on the shins when he was "coming at her."
[33] The daughter, Nancy, testified that she had seen her mother slap her father, but not on many occasions. She further testified that she had seen her father hit her mother. No other witnesses were produced to corroborate plaintiff's testimony with reference to her husband striking her, although she testified that he had done so in the presence of others, including her parents.
[34] At one time plaintiff was, according to her testimony, being treated by a physician for anemia. She stated she was told that this condition was caused by vitamin B deficiency due to a gland condition. She further stated that when she bought medicines and vitamins to cure this condition defendant complained that such purchases were an extravagance.
[35] Plaintiff testified that since moving to Webster Groves defendant has complained constantly about her housekeeping; that he complained about the house being untidy; complained frequently about clothes being around the house; that when clothes had just been taken off the line and brought into the house and before she had time to put them away he would complain; that he would complain when their son Dick would take off his clothes after coming home from school and leave them lying around; that he complained about everything; that he would come into the room and complain about the first thing he saw; that he would complain about the floor being dirty when Nancy had just scrubbed it, and complain about a room being in disorder when it had just been cleaned.
[36] The daughter, Nancy, testified that when her father came home in the evening he would usually talk about the condition of the house and want to know why it had not been cleaned. She stated he would direct his remarks to the first person he met and would talk in a loud voice and sometimes display temper. She said this was a daily occurrence.
[37] Plaintiff testified her husband's complaining was so constant that it was necessary for her and the children to go to bed early at night and stay in bed late in the morning in order to get a little peace; that after he would come home he would rant until he went to sleep.
[38] Defendant admitted that during the last two years he did complain about the condition of things around the house. He stated that he complained principally about his wife leaving things for the children to do. He testified: "She would leave the dishes, leave the beds, leave everything to the children — they were perfectly capable of doing it, and I think should have done it, but the children would come home and not pay any attention, and then when I would come home in the evening there would be a *Page 159 
houseful of dirty dishes to wash, and everything to put away, clothes had to be put away, and that all came around six o'clock, and the boy would have to go to the store, then she would get after them * * * and I would have to come to her rescue and had to beat them off — sometimes they made life miserable for her * * * the children at that time were as large as she, and both as strong as — well, as strong as I am. She would tell the girl to go down and take care of the dishes and the girl would cry and tell her she would not, and one time she said the girl kicked her, and I went there and got the girl and boy and marched them downstairs by bodily force — I never saw two more unmanageable children."
[39] Asked about the condition of the house when he would come home, defendant replied: "Well, the condition of the house wasn't so bad * * * but there was a houseful of dirty dishes. No one would do the dishes sometimes, and sometimes they came in before I did and she would get on the children and force them to do it, or herself, or she wouldn't be home and there would be clothes in the tub, in the dining room, and the children came in occasionally and would take off their dirty socks and put on new ones and drop the dirty ones on the kitchen floor — it was very discouraging — they were getting out of hand, and the children were too hard to handle for either one of us."
[40] Plaintiff testified that except for one time, the dishes were not left over except when she was ill. She denied that Nancy ever complained about having to wash the day's dishes in the evening, and denied that it was the cause of argument. She stated that since she had been working she had to leave early in the morning and did not have time to wash the dishes, and that Nancy, during the past year, had assumed the duty of washing the dishes without her even asking her to do it. Upon further questioning plaintiff testified that Nancy may have complained about washing the dishes, but there was never any long time complaint, and that she did not think that it was Nancy's complaining that brought about some of the unpleasant language between plaintiff and her husband.
[41] Plaintiff complains of defendant's treatment of the children. She testified: "He has abused Dick since he was a tiny baby. Dick was never very strong and he has grown very fast and he always said Dick was lazy. * * * He punished Dick physically, brutally, unmercifully * * * he punished him constantly * * *. He always punished him with whatever happened to be found handy. * * * since we moved to Webster he has broken over his back, well, he bent the handle of my wall duster, which has a handle the thickness of a broom handle, broken his bow and several dozen finely made arrows, oh, everything else of suitable size and shape."
[42] Plaintiff testified that when she would request money of defendant to provide new shoes for Dick, after he had outgrown the ones he had, defendant would reply that Dick should wear the old ones, even after she would explain that the shoes were too small for the boy's feet. She stated that on such occasions she would buy the shoes out of what she could save of the grocery money.
[43] The daughter, Nancy, testified that on one occasion, the previous spring when she had a number of boils in her ear, her father, while angry, struck her on the ear with his fist, causing her to suffer great pain. She further stated that she had seen her father strike Dick over the back with a bow, and with the handle of a duster. She stated the bow was six feet long and broke at the time.
[44] When defendant was asked about slapping his daughter, he replied: "I knew she had a boil in her ear. I sent her to a doctor, and she went to a doctor, but as far as I know I didn't slap her on the ear. I remember one occasion I spanked her, but that was after the filing of this divorce." Asked if he slapped Nancy about the head, defendant replied: "No, not about the head, it might have been I didn't know she had a boil — the only time I got after the children was for lying and insolence to their mother, and on helping." *Page 160 
[45] Mr. Greenbury's sister Sarah, when asked if on occasions she had to get between defendant and Richard to keep defendant from striking the boy, replied: "There may have been a time but there was a reason for it." She also testified: "I have also protected the girl from her mother." She further testified that she did not take defendant to task about the way he was treating his family, but said: "I believed that he should be a little more lenient with the children, and said that also to the wife when occasions arose. I was friends to both of them."
[46] Plaintiff testified that their daughter, Nancy, wanted to fix up a place where she could have her friends — a sort of private nook — and that she (plaintiff) suggested the back porch. Acting on this suggestion, Nancy and her boy friend started painting the back porch. Plaintiff further stated that defendant came home about that time and flew into a rage, and told them not to do it, and snatched the paint out of their hands. Shortly after that defendant himself painted the porch.
[47] Plaintiff further testified: "Another time, in an effort to effect a compromise, I suggested the attic might be a place where she could fix up and have her friends over, and she and a girl friend started cleaning the attic, putting the furniture that was up there, and various things, under the eaves, so as to clear a space where they could have a little fun. * * * He came in while they were doing that and there was quite a repetition of the previous difficulty. He told her not to do it; snatched the things out from under the eaves, put them back where they had been, and ordered the girls out. His voice was very loud and unpleasant when he did that."
[48] Defendant testified that at times he would use corporal punishment on the children. The form of this punishment was, according to his testimony, "spanking them on the seat. They would stand there and wouldn't budge — the girl would stand there and wouldn't budge. I blamed the wife, and she wouldn't cooperate. She could see them do these things, and not try * * * and they were at an age where they would balk at everything."
[49] Defendant further testified that plaintiff would ask him to chastise the children a couple of times a week; that sometimes Dick would mock his mother and jeer at her; also nudge her as he went past her, and make life miserable for her. Defendant admitted that he broke an arrow while striking Dick over the "seat," stating that it happened about a year and half previously when Dick was about fourteen years old. He stated that Dick was very stubborn and would not listen to reason.
[50] When defendant was asked if it was true that he was quarrelsome when he came home in the evenings, he replied: "I don't think it is. I was tired and might have been quarrelsome some time, but as a general rule I don't think I was quarrelsome. I got pretty tired and I thought the children would start up as soon as I got in, they took advantage of the situation, which is natural for children of that age."
[51] Defendant further testified that the last two years he had complained several times a week about the condition of the house; that if he saw something that needed correcting he complained it was hurting her and the children; that the children were getting out of hand; that he complained principally about plaintiff leaving things for the children to do; that plaintiff worked away from home the last two years; that the girl would stay out late at night and he objected to that, and the boy would run away when they tried to get him to do things around the house.
[52] Defendant was asked about discussions he had with his wife about working outside the home. He replied: "Well, the principal discussion was the children would get out of hand: she would be away from home all day and would come home and there would be nothing done, couldn't get the children to do it, and she said she needed money, but the money she earned didn't amount to the trouble it gave us — the grief we have had over the whole thing, principally the children, because she was earning some money by writing at home, and I thought that was enough."
[53] Mrs. Greenbury bought groceries at a store which was a mile away from where the parties lived. She testified that she *Page 161 
had many times requested her husband to go shopping with her and help carry home the groceries, but that most of the times he refused to go with her, and when he did he complained about the weight of the bundles. She further stated that at that time she was suffering from anemia and was very weak.
[54] Defendant testified that plaintiff never did complain about having to carry the groceries home; that he thought the children could help her, and had bought them both a bicycle so that they could go to the neighborhood store for things they had to have; that the main things were purchased over the week ends, and his sister who owned an automobile would usually assist in bringing home the groceries. He stated that he would get the groceries when necessary.
[55] Defendant's sister testified that during the time the parties lived in Webster Groves she would regularly, every Saturday, haul the groceries home for plaintiff. She stated she also helped carry them into the house, even though the children were at home.
[56] Plaintiff complained that defendant was too exacting in his demands with reference to the housework. She testified: "He was always telling me how to do things — for instance, he would try to insist that I do things which were physically impossible, such as washing the windows on the outside which were stuck with paint and I couldn't open. He would say he could open them, why couldn't I?" She stated that when she would ask defendant to help her, "he had two typical replies — one, when we were first married he used to mock me and say, `help me! help me!' but he didn't help me, and then later he would say, `I can do it, why can't you?'" She stated that many times he would say, "do it yourself."
[57] Plaintiff further testified that a number of times when she was ill she employed a woman to do the housework. She stated that defendant complained about this, saying that he did not want anybody in the house, and that she should do all the work herself. Plaintiff stated that she herself had earned the money through her art work to pay for this help.
[58] Plaintiff testified that the Superintendent of Schools of Maplewood recommended her for a position in the Rock Hill School, and one evening a man from the Rock Hill School called at their home to interview her concerning the position. She stated that her husband was at home at the time and became very violent and was very insulting to this person who called, giving him to understand that he was not welcome and that he (defendant) did not want plaintiff to take the job.
[59] Defendant denied that he got into an argument with the man from the Rock Hill School, or flew into a rage, but said he asked his wife not to take the job. He stated he might have told this man in positive terms that he did not want his wife to teach school, but did not manifest any temper while doing so.
[60] Plaintiff stated that defendant would rave about her being extravagant, and on five or six occasions told her if she wanted things to go out and earn them herself. Defendant denied that he ever told his wife that she should go out and earn her own money. He stated that there was no need for her to work. In 1944, when his wife was working at the Rock Hill School, defendant was working overtime each day and receiving close to $300 per month.
[61] The parties maintained a joint checking account at the bank in which defendant deposited all of his earnings except such as would be used to purchase savings bonds or that which was put into a savings account. Plaintiff testified she was restricted to drawing $20 per month for groceries, and that defendant gave her other money only on rare occasions, and only after urging, insisting, and pleading. However, the evidence shows that plaintiff did draw other checks on this account with defendant's knowledge and consent. Defendant testified he did not forbid her to draw more than a certain amount. He stated his wife would draw $20 per week for groceries, and if any real necessity arose she would draw more. There was also a joint savings account of $600 open to her. It appears that all bonds were purchased in the joint names of the parties. Defendant testified that *Page 162 
sometimes he paid the bills and sometimes plaintiff paid them.
[62] Defendant offered in evidence checks and bank statements showing that he had deposited in the joint bank account a total sum of $9,481.02, and that $1,716.57 was deposited in 1944; $3,072.57 was deposited in 1945; $3,226.24 was deposited in 1946; and $1,191.64 had been deposited during the first four months of 1947. These exhibits showed that money had been withdrawn on checks of both plaintiff and defendant.
[63] Mrs. David F. Goldberg, Mrs. John K. Sterling, and Mrs. A. C. Cooper, in addition to testifying as to plaintiff's good character, gave testimony to the effect that Mrs. Greenbury kept her home well, especially in view of what she had to work with.
[64] The trial court found from the foregoing evidence that plaintiff was not the innocent and injured party, and therefore not entitled to a decree in her favor.
[65] Appellant contends that, under the evidence adduced, she was entitled to a divorce and that the judgment appealed from should be reversed and the cause remanded with directions that plaintiff be granted an absolute divorce, with custody of the children, and alimony for the support of herself and the children. We cannot sustain this contention.
[66] One of the principal allegations in plaintiff's petition was that defendant nagged at her and the two children; that defendant was cross, fault finding and exacting, and unreasonable in his demands. The evidence showed a considerable wrangling and quarreling between plaintiff and her husband during their married life, but we are not convinced that it was due entirely to defendant's fault, but was due in a large measure to a lack of conciliatory temper in both parties, and plaintiff's neglect of her household duties as a result of her desire to seek independence through outside employment. Defendant's part in these bickerings, being induced on a large measure by plaintiff's dereliction, cannot be considered as indignities within the meaning of the statute. Holschbach v. Holschbach, 134 Mo.App. 247, 114 S.W. 1035; Webb v. Webb, 44 Mo.App. 229; Griesedieck v. Griesedieck, 56 Mo.App. 94.
[67] The charge that defendant was miserly and neglected to provide adequately for the support of plaintiff and the children must fail. It appears that during the early part of their married life this couple were victims of the general economic depression which prevailed generally throughout the land. This crisis was met and finally conquered by the parties in a most courageous way. With the coming of better times, after defendant secured employment with the Wagner Electric Company, their living conditions improved, and while the support which defendant provided might not have been as good as plaintiff desired, it appears that it was adequate considering the amount of defendant's income. It does not appear that defendant squandered any part of his income, but devoted it all to the support of his family, after making provision for savings.
[68] The charge that defendant informed plaintiff that she must support herself, and that he forced plaintiff to provide for her own support during most of their married life, is not established by the evidence. The evidence shows that after the parties moved to Webster Groves plaintiff voluntarily sought employment outside the home over defendant's objections. This could not be considered as an indignity on the part of the husband. Snuffer v. Snuffer, 213 Mo.App. 311, 249 S.W. 673.
[69] Plaintiff testified at length in support of the charge that defendant refused to furnish plaintiff with the means to supply certain household needs. She stated that when the parties moved to Webster Groves it was necessary that plaintiff use rags for window curtains, but there is nothing in the evidence to show that this condition continued. The evidence also shows that the rug in the living room was frayed in one spot and that defendant has refused to buy a new one; that he has refused to buy slip covers for the furniture in the living room, or new linoleum for the bathroom or kitchen. There was also *Page 163 
evidence that the wallpaper in the daughter's room was cracked and hanging down. These conditions, no doubt, are unpleasant to a person of plaintiff's temperament, but we do not believe that defendant's refusal to immediately comply with plaintiff's wishes in these matters can be said to be conduct reasonably expected to render plaintiff's life intolerable. Defendant did make considerable effort to better the conditions of the house, by cleaning and painting it, both inside and outside. This work was done while defendant was working overtime at his job and during his vacation period.
[70] In his treatment of the children defendant was not unreasonably harsh, as alleged. We are convinced that the children were greatly in need of discipline, and although defendant may have used severe methods on the boy on one or two occasions, such severe methods were in order. We are not convinced that defendant struck his daughter on the ear when her ear was filled with boils.
[71] The charge that defendant attempted to forcibly administer drugs to plaintiff for the purpose of causing an abortion was the subject of conflicting evidence. The same is true with respect to the charge that defendant struck his wife on several occasions. The trial court had this evidence before him and found against the plaintiff. The trial judge also had before him the parties and witnesses in person, and was by reason thereof in a better position to judge of their credibility than we are with nothing but the typewritten record before us. In such a situation we must give due deference to his finding, although we are not bound by his conclusions. With this rule in mind, we have carefully considered and weighed the evidence and have reached the conclusion that plaintiff has failed to establish, by a preponderance of the credible testimony, the truth of these charges.
[72] There were other matters complained of by plaintiff which we consider as trivial in their nature, such as the incident of the light switch, testified to by plaintiff, and her complaint with reference to the purchase by defendant of a lathe, camera and stamp collection; and her statement that defendant complained about her cooking during the early days of their married life; and the complaint of disdain shown when plaintiff would express her opinion during conversations with the family group over matters of business. The same is true of plaintiff's allegation that defendant complained she was losing her figure at the time she was pregnant; and defendant's complaints when she assisted him with the painting. These small incidents, scattered over a period of approximately twenty years, do not establish a course of conduct which would reasonably tend to the subversion of the family relation. Plaintiff's testimony with reference to defendant's refusal to assist her in carrying home the groceries was, in our opinion, successfully contradicted.
[73] Our conclusion on the whole case is that plaintiff failed to make a case warranting her to a decree of divorce. The judgment appealed from is affirmed.
[74] HUGHES and McCULLEN, JJ., concur. *Page 409