[1] This is an action for divorce brought by the wife against the husband. She was granted a divorce and $500 alimony in gross, and $50 per month for the maintenance of their two minor children. The custody of the children was awarded to plaintiff during the school year and to the defendant during the summer vacation, with the right of visitation to each party once a month, and divided custody during the Christmas holidays. The defendant has appealed.
[2] The petition alleges the following indignities: "that defendant habitually mistreated the plaintiff by making it plain to her that his parents were first and she was second in his consideration and concern; that defendant permitted his father to dominate and control his business and affairs and instead of the defendant establishing a home for himself and the plaintiff he remained on the farm of his parents in Adair County, Missouri, becoming virtually dependent upon them economically and plaintiff and defendant became practically the mere farm hands of defendant's parents; that defendant became wholly indifferent to plaintiff, her interests and her welfare; that defendant devoted his time and energies to the service of his parents in their farming operations and expected plaintiff to do likewise; that defendant would frequently demean plaintiff's parents to her and make disparaging and derogatory remarks concerning them calculated to humiliate the plaintiff; that the indignities accorded the plaintiff by defendant greatly affected her health to the extent that she almost had a nervous breakdown and condition in life as the defendant's wife became intolerable by reason of said indignities and she separated from the defendant on the 5th day of July, 1947." The answer admits the marriage and the birth of the children, but denies all other material allegations. *Page 556 
[3] The assignments of error are that the evidence is insufficient to warrant the granting of a divorce to plaintiff, and that the court erred in admitting in evidence numerous privileged communications between husband and wife.
[4] The parties were married on June 4, 1941, at which time the plaintiff was 20 years of age and the defendant was four years older. Their first child, Victor Francis Hoffman, III, was born June 7, 1942; the second child, Howard Jay Hoffman, was born June 29, 1944; the parties separated on July 5, 1947, and this suit was filed on February 16, 1948. Plaintiff had lived with her parents on a farm in Sullivan County and defendant had lived with his parents on a farm in Adair County. Immediately after the marriage the young couple went to live with defendant's parents for about two months until a new house could be completed for them on the farm of defendant's parents.
[5] At the time of the marriage plaintiff's father told her that he would give her $100 in cash or an old house which he owned. She and her husband decided to take the old house and use the lumber therefrom in building their new home. Defendant's father paid all other costs of construction. It was a very comfortable four-room house, and the plaintiff testified that it was nicer than 90% of the farm homes. Most of the furniture was bought by plaintiff from money she had saved teaching school.
[6] From a reading of the above quoted allegations of the petition, it will be seen that the basic grounds for divorce and the principal trouble between this young couple was defendant's relationship with his parents.
[7] The transcript contains approximately 400 typewritten pages. We have read and reread it, and shall review the evidence as briefly as possible.
[8] The record discloses that Victor Hoffman, Sr. who had been a farmer and cattle trader, had lost all his property in the early days of the depression and was left owing approximately $1500 of unsecured debts. In the fall of 1934 he entered into a contract to purchase 230 acres of land in Adair County for $7500, which contract required no down payment, but stipulated that the deed should be held in escrow until the purchaser had made certain improvements on the farm and paid at least 20% of the purchase price. Mr. Hoffman, his wife and son, then about 17 years of age, discussed the situation and arrived at a general understanding that the farm should be purchased and that the son should aid in its operation and would have a one-half interest in the livestock and machinery and a 50% interest in the profits, and when the farm was paid for he would be deeded a certain 80 acres. They moved on the farm and began the accumulation of purebred Angus cattle, which were registered in the name of "Victor Hoffman and Son." Other livestock, such as hogs, horses and Jersey cows were acquired. The Hoffmans were reasonably successful and by 1943 they had paid $2000 on the purchase price of the farm and received a deed in the name of Victor Hoffman, Sr. and his wife who gave a deed of trust to secure the unpaid balance of approximately $5500; they had also paid the $1500 unsecured indebtedness and had made substantial improvements on the farm, as well as increased the livestock, machinery, etc. By 1947, the year of the separation of these parties, they had paid $6000 on the mortgage, reducing that debt to $1500; there were no other debts of consequence, and the bank account, which was in the name of Victor Hoffman, Sr. showed a balance of approximately $1000; the new home, in which plaintiff and defendant had lived had been built; a barn and a large shed for cattle had been constructed, and the purebred herd had been considerably increased and was worth several thousand dollars at that time; there were also several Jersey cows and a number of hogs, a new tractor and other modern farm machinery. The joint taxable income for the year 1946 was in excess of $6000. In addition to this, sometime after plaintiff and defendant were married, there was purchased for $3,725 an 80 acre tract lying across the road from the 80 acres which the son was to receive. The title was taken in the names of plaintiff and defendant and paid for by check drawn on the *Page 557 
bank account of Victor Hoffman, Sr. for $725, and a mortgage executed by plaintiff and defendant for the balance.
[9] In about 1941 Victor Hoffman, Sr. suffered a heart attack and from that time on was not able to do much physical labor, and as a consequence most of the burden of the farm labor on this 310 acres had to be done by the son.
[10] At one point in her testimony plaintiff stated that she knew nothing about the business agreement and relations of her husband and his parents and had not heard of it until the day of trial. However, at another place these questions were asked and answers given.
[11] "Q. Now, do you know what interest your husband had in this livestock? A. Yes.
[12] "Q. What interest did he have in them? A. His interest in the livestock and machinery there was on the partnership basis. Our income tax form was made out that way. * * *
[13] "Q. What interest did he have, interest, fraction or percentage? * * * A. Fifty per cent, half. * * *
[14] "Do you know how the income was handled from the whole farm with reference to income tax? * * * A. Yes, I saw it and went over it."
[15] She also knew the purebred cattle were registered in the name of "Victor Hoffman and Son." Furthermore, she testified that before the marriage she went to the Hoffman home and discussed with them the type house to be built for her and her intended husband, where it would be built, and that the 80 acre tract upon which the house was constructed was to be deeded to her and her husband at the time the elder Hoffmans secured their deed to the 230 acres. So, on this point, the only conflict in the evidence is as to when she and her husband were to receive the deed to the 80 acres.
[16] After the parties were married they moved into their own home and had their own chickens, the income from which plaintiff kept as her own, and she and Mrs. Hoffman, Sr. divided equally the income from the dairy products. Plaintiff's share amounted to several hundred dollars each year. The bank account was always carried in the name of Victor Hoffman, Sr. but the son and Mrs. Hoffman, Sr. had always had the right to draw checks on the account for any purpose they desired, and after plaintiff and defendant were married, Mr. Hoffman, Sr. requested plaintiff to go to the bank and execute a signature card so that she also could check on the account for any purpose desired. This she refused to do.
[17] We make this general statement of the background because, as we view the evidence, it constitutes the real basis for most of the trouble between these parties.
[18] We now consider plaintiff's charges of indignities which rendered her condition as defendant's wife intolerable. One complaint is that defendant would not take her to Sunday School as often as she desired. She stated that in the spring they would go; in the busy summer season he would not take her; in the fall they would go some, but in the winter they did not go. She also complains that the defendant did not take her to social gatherings and to Kirksville and to visit her parents as often as he should have. She admitted that they belonged to a group of young people in the community, who met occasionally to play cards and have dinner in the home of some one of the group, and that she had entertained them in their home. Two of the neighbors testified that plaintiff and defendant visited with other young people about as much as was usually done, and that they seemed happy together. With reference to her going to Kirksville, she stated that he took her when it was convenient for him but that more often, when she wanted to go, he would tell her to go with his mother and father, that he had work to do on the farm, but she preferred to go with him. It is in evidence that the mother and father went to Kirksville two or three times a week. With reference to visiting her parents, she stated that he did not take her more than two or three times a year, and that she wanted to go every month or six weeks. Her parents lived about 40 miles from where plaintiff and defendant lived. *Page 558 
[19] However, as we read the evidence, these derelictions are not the real and fundamental causes of the separation. The real bone of contention was the desire of plaintiff to separate herself and her husband socially and economically from his parents. On one occasion she stated to her husband and his mother: "I don't want but two things. I would like to have our own business, our own money we make. I would like to have a little consideration from Francis (her husband) about what is going on. I would like to be considered just once as to what we are going to do." She had insisted all along that the 80 acres on which their house was built was to be, and should be, deeded to her and her husband at the time the elder Hoffmans got their deed to the 230 acres; whereas, they contend it was not to be deeded until the land had been paid for and the mortgage released. She complains because her husband did not insist upon his parents making them the deed before the mortgage was paid. She also complains because the earnings of the farm operations were carried in one bank account in the name of Victor Hoffman, Sr.; she wanted a division of that so she and her husband would have their share in a separate account, and criticized him for not insisting upon that being done. But, as stated above, her husband had the right to draw checks on that account at any time and for any purpose, and she was requested to sign a signature card which would permit her to do the same. This she refused to do. To illustrate her feeling and her attitude about this matter, she testified that when she would order some article from Montgomery Ward or some other company she would have some member of the family sign a check on this account and then take the money to Mr. or Mrs. Hoffman to pay for the amount of the check; that they frequently told her she need not do this, but she said the reason she did it was "because I wanted to emphasize to them how much I disliked the way the bank account was, how dependent Francis and I were on them. We had nothing."
[20] There is evidence that during their married life defendant was connected with the Triple-A Program in his county, for which he received approximately $200 each year; that he did some custom farm work for neighbors, for which he was paid. This money, together with funds from the poultry and dairy products was spent by plaintiff and defendant in their own way, in addition to the right to check on the bank account. There is nothing in the record to indicate that these parties ever wanted for anything.
[21] She also complained because her husband spent so much time at the home of his parents; that he didn't do anything on the farm without first consulting his father, and that he couldn't go anywhere without going by their house and telling his mother and father good-bye; that she frequently had to wait dinner for him while he visited with his parents. The husband denied that he had to consult his father about everything that went on concerning the farming operations, but he frequently acted on his own initiative and judgment; that he did keep his father fully advised of their farming problems and consulted him with reference to planting crops and in the purchase or sale of stock, and that he went to their home principally because of his father's physical condition. The plaintiff testified that she went to the elder Hoffman's home two or three times each day, read the paper and visited with them; that Mrs. Hoffman frequently helped her with the children and with her work, and particularly when she was not well; but she complains that her husband had to work so hard and she felt he was doing it solely to shield and protect his father, and assumes the attitude that she and her husband were mere hired hands.
[22] These are general statements concerning her feelings and attitude about the relationship of the parties. We will now consider some specific incidents contributing to the separation.
[23] Sometime before the birth of the second child in June, 1944, plaintiff stated that she was ill and irritable, and it was about this time that one of the major breaks or occurrences took place. Plaintiff's father and defendant's father had some dispute about the relationship of their two children. The record does not make it clear what occurred, *Page 559 
but about this time defendant took his wife to visit her parents on Sunday and the following Wednesday he went back to bring her home. She met him at the door and asked him to come in and then called to her father and mother to come into the room. She then asked her husband if he had stated to her father that he had been "living in Hell for the last year." She said he admitted making that statement, but that he did not mean it in the way she construed it. It seems her father told her about this statement after he and Mr. Hoffman, Sr. had their dispute. He said he was telling her because "* * * you are sick and I want to tell you this because of the accusation they made against me." The husband stated to her in this conversation that she had been very irritable, and she admitted that was true, and that she had been ill, and he said: "Ruth, I want you to come back." And she said, "`Francis, I don't see how we can work out things. * * * You haven't listened to me on a single thing I have wanted, to have some money of our own and a few things we have worked for and several things together, and I want free time to go places.' He said, `Well, Ruth, we will try to work it out and we will go over in the morning and have an understanding with our parents.' And I said, `Francis, will you honestly do that?' And he said, `Yes, Ruth, we will.' And so I went home with him and we went over to the folks the next day and Victor had a heart attack, * * * I told him (Victor) what Francis had said about me and I told him, `I don't see how we are going to work out anything together.' * * * `As far as I can see we haven't had much to base our marriage on so far.' * * * At the time of our marriage Francis and I had the understanding part of the land and especially the land where our house was was to be ours. * * * He (Victor) said, `It would not belong to us until the place was paid for', and I said, `It was my understanding as soon as the deed was to be obtained it was supposed to be changed.' * * *
[24] "Q. What did Victor Hoffman say? A. He says, `Ruth, you know we can't change this deed. That would cause a lot more expense. We can get this place paid for a little quicker.' After he had this heart attack he said, `Well, Ruth, if that means that much to you I may die anyway, I will change that.' I said, `Victor,' — I felt very sorry. I cried about it. I says, `Victor, it is not the 80 acres I want. If you will really go ahead and make an effort and instead of spending the money so many different ways I will stay.'
[25] "Q. When you said spending the money in many different ways, it was all spent in all farm improvements, improvement of the farm, wasn't it? A. But never once was I consulted. They said I had access to the bank account. All the rest making suggestions to me. Overlording incidentally. * * *"
[26] Defendant's version of this episode is that when he went for his wife on Wednesday night she and the older child met him at the door and greeted him cordially. He went into the house and at that time her father entered the room from another door and called to his wife, Cora, to come into the room. He told the defendant to shut the door and sit down. Plaintiff's father then stated: "Francis, didn't you tell me that living with Ruth was like living in Hell?", to which the defendant replied, "Not to that effect. I told you that when she got mad and out of humor, had a mad fit, it was then but she could be just as nice as anyone. * * * He had told me after we were married that she had a very bad temper and disposition at times and if she ever got that way and I needed help to come to him and he would help me.
[27] "Q. What did he say to that? A. He just denied it.
[28] "Q. What did Ruth Hoffman say? A. She just sat there. * * *
[29] "Q. What was said further in that conversation? A. After he said that, he said, `Francis, your Dad isn't what I thought he was. I want him to deed you and Ruth the 80 acres of land. I asked him to do it and told him I wanted him to do it now and I asked him the other night and he said he couldn't. I want him to do it now and I *Page 560 
want Ruth to have a say and an interest over there in that so I can tell her what to do.'"
[30] Just prior to the above occurrence another incident occurred which we think is worthy of note. Plaintiff's father and brother came to her home for a visit and while there her father observed that she was not well and suggested that she go home with him for a visit. Plaintiff asked her husband what he thought of the suggestion and she testified that his reply was, "Oh, well, if you go over there you can stay." Whereupon she told her father she would not go under such circumstances. Defendant's version is that when her father and brother came to their house her father first went over to see Mr. Hoffman, Sr., and when he came back he very shortly said, "`Francis, I am going to take Ruth home with me tonight. * * * I think her health is bad and I am going to take her home where I can take care of her. She oughtn't to do anything but sit down.' Well, I says, `I don't think she needs to do that. Ruth and I have gone to the doctor together. She is getting all the rest she needs. He says she needs some exercise.' Well, he says, `I am going to take her home.' I said, `I don't think or feel she needs to go under those conditions.' * * Ruth didn't say very much, but she said, `I don't believe I need to go.'" This conversation took place before the birth of the second child, and at the time plaintiff admits she was not well and was irritable. As a result of what occurred on that visit, her father and mother never again came to visit in the home of plaintiff and defendant. These two conflicts occurred in the early part of 1944, some three years before the separation.
[31] Plaintiff testified that after the above conversation with Victor Hoffman, Sr. in 1944, she did not again mention to him the question of deeding the 80 acres to her and her husband, but that she did continue to discuss the matter with her husband and at different times mentioned the same question to Mrs. Hoffman, Sr. About two weeks before she left Mrs. Hoffman asked her, "If we give you the land now what assurance will we have that you won't leave anyway?" Plaintiff stated, "I laughed. I said, `Florence, you don't ever intend to give us the deed to any of this land.' * *
[32] "Q. And so because you knew they had the intention of never giving you any of that land you knew the situation was hopeless and walked out? A. That's right."
[33] Mrs. Florence Hoffman's version of this conversation was that plaintiff's reply to her question was, "You had better keep your damned old farm because I may leave anyway. I may leave anyway."
[34] She tells of the events on the day of the separation in this manner:
[35] "Q. Now the day you left give us the circumstances, anything in connection with your leaving tell us the facts? A. Well I had said at different times for a long while, I think it was since in February, I had been promised by Florence (Mrs. Hoffman, Sr.) that the place would be paid for and we would have our own home and I would be given some consideration in our home and so forth and so on. * * * I went over to Florence's and read the newspaper which was a course I always followed. * * *
[36] "Q. Did you find out from some source that they didn't pay for the place? A. Yes. * * * I took Howard back home and made up a batch of cookies. * * Well, I washed the dishes and got the boys ready to go to town. * * * Francis and I had discussed it. I said I would be leaving. * * *
[37] "Q. Who went to town? A. Francis and I and both of the boys. We drove around the square two or three times to find a parking place. By the time we parked I said that I wasn't going back home with him and that was all that was said and I took Howard and Vic stayed in the car with Francis. * * *
[38] "Q. Getting back to the day of your departure, you left your home with the intention of leaving forever? A. No, I didn't. I made up my mind on the way to town. If I had made up my mind for sure I would have taken something with me. As we went to town the more I thought what I saw how everything was impossible. *Page 561 
I did have my mind made up by the time we got to town. I didn't before or I would have taken a few clothes for Howard."
[39] She and Howard went home with her parents and defendant and Vic returned to his home.
[40] A few days after the separation she returned to her home to get clothing for herself and Howard. Her mother and brother were with her. When her husband saw her coming he went up to their house and unlocked the door and in due time his father came. While plaintiff was packing the clothing defendant's father asked her, "`Are you leaving?' I said, `I have already left.' And that was the only words exchanged, I think I had with Victor. Well, he said, `why don't you and Francis go to see a lawyer together?' I said, `We have had our chance and we can't do anything else together as I can see it.'" She left and returned to her parents' home. A few weeks later she accepted a position to teach in a country school and lived at her parents' home. In the summer of 1948 and at the time of this trial, she was attending Teachers College at Kirksville and doing secretarial work in the Dean's office, and returning to her parents' home on week-ends, where her younger child was living.
[41] There is evidence to the effect that defendant had not contributed anything to the support of plaintiff or Howard after the separation and had not been to see them. He said he had not gone because he felt he would not be welcome. At Christmas, following the separation, the defendant and his mother and father sent Howard a present. Plaintiff received it put and it away for several days without showing it to Howard and, after due deliberation, she returned it on January 10, and wrote defendant this letter:
"Dear Sir:
"I am returning the gift you Victor, Florence and little Vic sent Howard for Christmas. If you and little Vic wish to send Howard a gift it will be accepted, but not from Victor and Florence."
[42] In her oral testimony concerning this matter she stated: "I am not going to allow him to receive a gift from his grandparents."
[43] There are other bits of evidence offered by both parties, but we do not deem it of sufficient importance to lengthen this opinion for a recital of such facts. What we have said presents a fair picture of the conflict between these parties.
[44] This being a divorce case it is our duty to review the whole evidence, and while giving due deference to the findings of the trial judge nevertheless to reach our own conclusions and render such judgment as the evidence in our opinion warrants. Kistner v. Kistner, Mo.App., 89 S.W.2d 106. It has long been established as the law that where the action is based on indignities, such indignities, in the statutory sense, must amount to a species of mental or physical cruelty, or of injury accompanied with insult or hatred, and they must be such as cannot be relieved by any exertions of the injured party. Indignities such as to warrant the granting of a divorce, ordinarily must amount to a continuous course of conduct. A single act or word, or occasional acts or words, will not suffice. The course of conduct must be such as to connote settled hate and a plain manifestation of alienation and estrangement. Indignities are such acts as consist of unmerited contemptuous conduct, or words and acts of one spouse toward the other which manifests contempt, or contumely, incivility or injury accompanied with insult and amounting to a species of cruelty to the mind. Haushalter v. Haushalter, Mo. App., 197 S.W.2d 703, 708; Elliston v. Elliston, Mo.App., 215 S.W.2d 63, 69.
[45] Every case based on indignities is a case unto itself, and so we must consider the merits of this case. After careful consideration we are unable to escape the conclusion that plaintiff did not make out a case for divorce on the ground of indignities within the meaning of the statute as construed in the cases cited supra and others cited therein.
[46] Assuming that defendant made the cold and unexplained statement to the plaintiff in 1944, that if she went home with her father at that particular time she could *Page 562 
stay, it was an isolated outburst and plaintiff continued to live with him as his wife for more than three years thereafter. The same situation exists with reference to defendant's statement to her father that he had been living in hell. After the explanation to her of that statement she returned home with him and they continued their married life.
[47] Turning now to the field of real controversy concerning defendant's business and social relations with his father we have a more difficult problem. The record discloses that the defendant was satisfied with the manner in which their business relations were being conducted. It is also clear that the business had been successful. In 1934, when the Hoffmans contracted for this farm, they were worse than bankrupt; by 1947, at the time of the separation, the value of the real estate and personal property, according to estimates given in evidence, was in excess of $20,000, with no debts of consequence except the unpaid $1500 on the mortgage. It is conceded by the plaintiff that the defendant had worked hard, in fact that was one of her complaints; but there were two things over which he had no control that contributed to his long hours: one was a breakdown in his father's health, and the other the World War, which made all labor exceedingly scarce. Plaintiff should have given serious thought and sympathetic consideration to this situation, but, on the contrary, she continuously insisted upon a separation of their affairs, and complained because he frequently consulted his father about their farming operations.
[48] It should be noted that there is no allegation, proof or intimation that defendant is an immoral person or an associate of such persons, or that he drinks or gambles or that he squanders his money or is lazy, or that he has a turbulent disposition or that he ever used or threatened to use violence or even intemperate language toward plaintiff, or that his family was not well provided for. On the contrary it is conceded that he worked hard, in fact, he worked harder than his wife thought he should; that he was frugal, and that he and his father had made a decided success of their operations.
[49] Under all the facts and circumstances in this case we are unwilling to say that defendant was guilty of legal indignities against his wife. He had worked hard and prospered and had every confidence that his father would comply with their agreement, and we cannot say that he did not have ample grounds upon which to base such faith. A man charged with the responsibility of supporting his family and accumulating a competency must be given a liberal latitude in conducting his business affairs. The courts can hardly say just how he should manage his business or how he should divide his time between his home and his business. Holschbach v. Holschbach, 134 Mo.App. 247, 255, 114 S.W. 1035; McGee v. McGee, 161 Mo.App. 40, 44, 143 S.W. 77.
[50] We have given consideration to all proper evidence in the record and conclude that the judgment granting plaintiff a divorce should be reversed and the cause remanded, with directions to dismiss plaintiff's petition. It is so ordered.
[51] All concur.