230 S.W.2d 142 (1950)
POLITTE
v.
POLITTE.
No. 27815.
St. Louis Court of Appeals. Missouri.
May 16, 1950.
Vernon C. Oetting, St. Louis, Ernest L. Keathley, St. Louis, (George E. Messing, St. Louis, of counsel), for appellant.
J. W. Thurman, Hillsboro, for respondent.
ANDERSON, Presiding Judge.
This is a divorce suit brought by George Politte, as plaintiff, against Elsie May Politte, as defendant. To the plaintiff's petition, defendant filed a cross bill. The trial below resulted in a finding in favor of plaintiff on his petition, and in favor of plaintiff and against defendant on her cross bill. From the judgment, defendant has appealed.
The petition for divorce is based upon the following alleged indignities charged by plaintiff to have been offered him by defendant, and which he claimed rendered his condition as husband intolerable. "The defendant on innumerable occasions from the time of the marriage until the day of separation called the plaintiff, his children and his friends abusive names and habitually used toward the plaintiff and his *143 intimates profane and vulgar language; the defendant was on numerous occasions involved in quarrels and fights of such nature as to call for the intervention of the police and the courts, and is now under parole; the defendant on one occasion, about a week after Labor Day 1946, followed the plaintiff for three blocks using abusive language and caused a scene which resulted in police court action; the defendant struck the plaintiff in police court; the defendant was cruel to the plaintiff by mistreating and being cruel to the daughter, Ruth, of the plaintiff, called Ruth vile names, struck "her, pulled the beads from the neck of Ruth and burned Ruth with the heated end of a lighted cigarette; the defendant threw a brick through the window of the residence with the intention of striking this plaintiff with said brick; the defendant refused to make or properly keep a home for the plaintiff; the defendant has considerable financial means of her own but refused to cooperate with the plaintiff in times of financial stress even to the extent of making a temporary secured loan, at one time the plaintiff was about to lose his business because of failure to have $500 to pay off the lien of a payroll tax, the defendant would not aid the plaintiff even though at the time she had $4000 cash in the house; the defendant had shortly before the separation property bringing her a net income of $190 per month but bought and held that property in her maiden name of Elsie May Glass, thereby ignoring her marriage name, and in effect repudiating the same."
Defendant's cross bill was based on the following indignities:
"(a) That plaintiff failed to provide defendant with the proper food and clothing and failed to provide for even the necessaries of life.
"(b) That plaintiff resented and objected to the love and affection shown defendant by his own children of a former marriage.
"(c) That plaintiff used profane and abusive language to defendant and toward his own children in the presence of said minor and infant children.
"(d) That plaintiff on numerous occasions threatened great bodily harm to defendant and also threatened defendant's life.
"(e) That plaintiff frequently struck, beat and assaulted defendant.
"(f) That on several occasions plaintiff dragged defendant about their home by the head of her hair.
"(g) That on one occasion plaintiff locked defendant in their living quarters and threatened to burn same down and poured paint about the doors and woodwork threatening to set fire to same.
"(h) That on one occasion which occurred on or about August 7, 1948, plaintiff assaulted, struck and beat defendant so severely that when she finally escaped from him, she fell unconscious by the roadside and was picked up and ministered to by passers-by.
"(i) That the conduct and demeanor of the plaintiff has caused defendant to suffer mental and physical anguish and pain; that during the time of their cohabitation the relationship between plaintiff and defendant has been strained and unnatural and not conducive to marital happiness; that by reason of such mental cruelty, defendant's condition as plaintiff's wife has become intolerable and unbearable."
The parties were married August 9, 1945, and separated August 7, 1948. Both parties had been married previously. Plaintiff had six children by his former wifethree of them small children in the custody of their mother. Defendant had no children. After they were married the parties lived in St. Louis until 1947, when they moved to a farm in Jefferson County.
Plaintiff testified that during the time he was married to defendant he furnished her a home and treated her with affection, but that during the three years of their married life defendant continuously planned for the day she would get a divorce. Plaintiff further testified that when defendant would get angry there was no limit to the kind of language she would use; that there was nothing too vulgar for her to say; that she had "called him a `son-of-a-bitch' more times than he had fingers and toes"; that she told his mother she was nothing but a "bitch", and that defendant would *144 call him these names in the presence of his children.
It appears that while living in St. Louis there was considerable quarreling and fighting between these parties which required the intervention of the police. Plaintiff stated that he appeared in the Police Court four or five times to answer complaints which defendant made against him. He stated that her insane jealousy caused him to be arrested, and that these charges were all dismissed except the first one, which resulted in his being convicted and paroled. He stated that after the last case was dismissed in the Police Court defendant struck him while there in the court. It appears that this incident occurred in September, 1947. The parties had been living on a farm in Jefferson County, and plaintiff had filed a suit for divorce on August 16, 1947, which was the fourth divorce suit that had been filed.
Defendant, who had left the farm, later returned, but again left on Labor Day and took up her residence at a rooming house which she owned and operated on Lafayette Avenue in St. Louis. A few days thereafter plaintiff was in St. Louis and received a message that defendant wanted to see him. There was a meeting of the parties which resulted in plaintiff's arrest. Plaintiff, in recounting the incident, stated: "I got into difficulty right away, and she got into a fight with the lady in the back seatGladys Whitethe wife of a fellow who worked with me. She (defendant) went around to the front (of car) and grabbed a stone and was going to throw it through the window. I got out and made her lay that down. She got back and threw a smaller one through. She did break the window slightly on the right side. I made her put that down and she called me a dirty name, and I socked her. That is what she had me arrested for." It appears that the charge against plaintiff growing out of this incident was dismissed when it came on for trial, and that as plaintiff was leaving the court, "she (defendant) hauled off and batted me and knocked me out of balance. They grabbed her and throwed her in jail."
Defendant denied that she ever threw a rock through the plaintiff's car.
On direct examination, defendant testified that on the occasion in question plaintiff asked her to put Gladys White out of the car, and when she told Gladys White what plaintiff had said, Mr. White got out of the car and started to "jump" on plaintiff, whereupon plaintiff turned on defendant and hit her, knocking her out for three hours.
On cross-examination, defendant testified: "He asked me to go up and get this woman out of the car. * * * I said, `Mr. Politte said he didn't want you in the car.' She and I didn't have any trouble. She went to crying. He stood back there. He got me by the hair of the head and pulled me from as far as here to the wall and started beating me. I don't know why he was beating me. I started to get in the car and when I did she had already told my husband to stay out of the house. She didn't want him in their home. I was going to sit there and talk to her and he flew off and I never. When she called him that bad name, he saw they were going to jump him and he laid it on me. I started to get in the car and it made him mad because I said, `Glady, Mr. Politte don't want you in the car.'"
Plaintiff further testified that on one occasion he was struck on the head by a milk bottle which defendant threw at him, and on another occasion was struck by a pan which she hurled at him. He stated that both times he received cuts from the missiles thrown. Plaintiff further testified that defendant at other times threw things at him but on each occasion he was successful in dodging them.
Plaintiff's daughter Frances Ruth Politte testified that she lived with her father and stepmother for about a year after their marriage, and during that time she had heard defendant use vile language in front of her brother and sister. She stated that defendant did not keep house, and that during the time she (witness) lived there she did all the cooking and cleaning. She further testified that she saw defendant drunk once; that defendant "drank whisky, hot toddies, coffee and aspirin, and coke and aspirin." The witness further testified that on one occasion she asked her fifteen *145 year old sister if she would like to get some ice cream, whereupon defendant told the witness that her sister could not go with her. Defendant then jumped at her and pulled off a Catholic medal she was wearing. The witness stated: "she called me a whore and said I laid up with every boy I came across." On this occasion defendant was arrested and convicted in the Police Court, but was put on probation.
Fred Bailey, an employee of plaintiff, testified that from February to May, 1948, he roomed at the place on Lafayette Avenue where plaintiff and defendant lived. He stated that the conditions there were very poor, the dishes were not washed, and the beds were seldom made up. He further stated that the home was almost always dirty; that defendant was a heavy drinker; that he had seen her drunk many times, and had heard defendant call plaintiff a dirty "son-of-a-bitch" more than once. He also stated that defendant made the statement "she would get that farm if it was the last thing she ever did."
On cross-examination, plaintiff testified:
"Q. How did you treat your wife; did you slap her around a little bit and curse her too? A. No, sir, not until she asked for it.
"Q. You admit you did strike her? A. Yes, sir, after she asked for it."
Plaintiff further testified that defendant would start an argument on Monday and "wind" it up the following week. He stated: "I would have to sock her to get along with her. It would wind up in the Police Court and it would be all over." On one occasion, according to plaintiff's testimony, defendant became angry and threw a brick through the window of their residence; that the reason for her anger was that she overslept and missed a chance to ride into St. Louis with him.
Plaintiff testified that about half the time defendant would not make up the beds, and that she did not keep the house clean. He stated that sometimes for two weeks straight defendant would not make up the beds. Plaintiff further testified that defendant drank intoxicants, and on one occasion got drunk and called police to have plaintiff arrested, but when the police were informed that she was drinking, and the police themselves saw she was drinking, they said they would lock her up.
At the time the parties were married plaintiff owned a farm one and one-half miles from DeSoto, in Jefferson County, Missouri. Plaintiff also held under a lease property located at 1609 South Twelfth Street in St. Louis. In February, 1946, plaintiff bought the property on South Twelfth Street. He borrowed money on his farm to make this purchase. Title to the Twelfth Street property was put in the name of plaintiff and defendant as tenants by the entirety. This property was sold on April 7, 1947, and defendant refused to sign the deed until she received a check for one-half the proceeds of the sale. One-half the proceeds of the sale amounted to $1,941.05.
Plaintiff testified: "Q. Did you have any understanding at that time as to whether one or the other of you were going to get a divorce? A. That was the reason for the separate checks. * * * The loan of $1600 I made on the farm to make the down payment is still on the farm. I split the value of the property I had with her with the understanding we were to get a divorce. She carried that check from April 7th to July 12th, and I found out, according to the record, she bought 2006 Lafayette and put it in the name of Elsie May Glass, a single person."
Defendant's maiden name was Elsie May Glass. Defendant conducted a rooming house at 2006 Lafayette Avenue. The deed for this property was recorded July 24, 1947. There was no divorce suit pending at this time, although defendant was supposed to get a divorce at the time the Twelfth Street property was sold.
Plaintiff further testified that shortly after the marriage he effected a change of beneficiary in all his life insurance policies to make defendant the beneficiary in them, but that when he asked defendant what she was going to do about her policies she said she would leave them in the name of Frank Brown, her former husband. Plaintiff further stated that defendant made the statement time and again that she thought *146 more of Frank Brown's little finger than she did of all of plaintiff. Defendant denied making said statement. Plaintiff further testified that he owned certain furniture which defendant had stored in her own name.
Defendant denied that she ever used abusive or vile and profane language toward plaintiff or his children. She stated she was never drunk but twice in her lifeonce when she was eighteen years old, and once when plaintiff's sister came over and gave her a big drink. Defendant denied throwing a brick through the window of their house with the intent to strike plaintiff. Defendant denied mistreating plaintiff's daughter, and testified: "I loved that girl from the day she entered my house, and the day she left she did not go of her own accord."
Defendant further testified that on one occasion plaintiff grabbed her and started to beat her; that his daughter came up and said: "Daddy, don't beat her anymore, don't beat her anymore." Defendant stated the police then walked in and took the plaintiff. She further stated that at that time plaintiff hit his daughter Ruth and knocked her on the bed.
Defendant further testified that plaintiff often told her he would kill her and had choked her before friends. None of the friends were called as witnesses.
On another occasion, according to defendant's testimony, while they were separated, he tried to get her to come downstairs and talk to him. She stated that when she told him she would not do so he put a ladder up to the second floor and said: "I will smoke you out"; then he got some paint and poured it on the windowsill. She further testified that on another occasion he locked her in the garage and started to set the garage on fire, when a Mr. Frank Passy drove up and told him to be quiet. Mr. Passy was not called as a witness. Defendant testified that on another occasion plaintiff hit her and knocked her down; that he "turned me over the studio couch, took my pants down and whipped me like a little baby." She stated: "I said, George, why are you treating me this way, when I am so good to your children." She stated that she got away and ran across the lawn and through the woods where three women and two men picked her up and brought her to a little store. She stated that she was then taken to Hillsboro, Missouri, and went into "the office where they write warrants." She further stated: "The lady in the office took me in the back room and looked at my hip. The lady was * * * I believe, wife of the Clerk of the Magistrate CourtMrs. Frazier. I didn't know what to do. They said I should have something done. I said, `All I want you to do is to keep him there until I can go to St. Louis.' * * * I am scared of him. I have lived in constant fear of him." None of the persons mentioned in this episode appeared at the trial.
Defendant further testified: "One time I got $300 money orders from my nephew and he wanted them. I asked him for $10.00. He said take that money if I didn't spend it on him. I went out in the car and he ran out there and grabbed my purse and tore it all to pieces and grabbed the money orders and tore them in little pieces. He ran up to Mr. Akers and said, `Can they put me in jail for this?' I was sitting there crying. When he came back he grabbed my head and got paint all over it. He got paint all over me. * * * He beat me several times. He knocked my teeth out. I have false teeth. * * * One time I got my hair set and his brother, Leo, was coming up. He was laying across the bed with his paint clothes on. He said, `That is why you have your hair curled.' I said, `Yes.' He grabbed my hair and threw me on the studio couch."
Defendant testified that on one occasion plaintiff came home and "stopped across the road. I don't know whether he was drunk or not. He said, `This is the last time you are going to sleep here.' I said, `What have I done?' He said he was talking to a wise man and he told him to kick the devil out of me and he brought out a nasty word."
Defendant denied that she failed to properly keep house, stating: "I kept his home clean and took care of his children and answered the telephone for him and *147 gave him what money I had. I was taking in a little better than $25 a month, and then I cashed in my bonds to help him all I could. I don't think anyone in that neighborhood had any better furniture than we had. * * * I have bought two dresses since the day I married him. My nephew gave me $100 the day he came out of the service and I bought two suits and one coat and he didn't pay for those. He has never bought me any dresses. What I took in, I gave it to him. I gave him money to pay the grocery bill. He never gave me one dollar."
Defendant further testified: "We were all getting ready to go swimming. I got all uneasy because there was an accident over the radio. I was sitting there and two of his men came in about that time and he started in and I said, `I will be damned if he is.' George said, `I will teach you not to use that word.' I said, `After you curse like you do?' He threw me on the bed and put soap in my mouth."
Mrs. Ruth Augustine testified on behalf of defendant. She stated she had heard both plaintiff and defendant use bad language toward each other. She further testified:
"Q. Did you ever hear him, on any occasion, threaten Mrs. Politte with great bodily harm? A. Just one time. One time we were playing cards and something went wrong with the play. It seemed like he put her out the door and dragged her back in and threw her on the bed and slapped her. She said, `George, if you don't leave me alone, I will hit you,' and he said, `If you do, I will kill you.'
"Q. Did you ever, On any occasion, see Mr. Politte drag Mrs. Politte around the house by the hair of her head? A. Just that one time. He had hold of her hair.

* * * * * *
"Q. On this occasion when you say you saw Mr. Politte slap her, do you know who provoked the argument. A. Everything happened so fast, I don't know what to think. It seemed like they were both made at one time.
"Q. You don't say Mr. Politte provoked the argument? A. No. I couldn't swear to that."
When asked if Mrs. Politte kept the house clean, the witness replied: "When Mrs. Politte was well, she did, and when she wasn't well sometimes it was messed up. When she had Ruth there she had her to help keep it clean."
Mrs. Juanita Wenger, a niece of defendant, testified: "On several occasions I heard him say: `You think more of the kids than you do of me.' I saw him when he pulled his daughter Ruth down the stairs and was beating her." Asked about threats by plaintiff of bodily harm to defendant, the witness stated: "I remember this: It was one night something happened and I was staying at their house. We were on the bed and Mr. Politte came up and sat in the chair and said he was going to wait for her to come upstairs and said, `When she comes upstairs, I will kill her.'" The witness further testified that she was present when plaintiff locked the defendant in the living quarters and threatened to burn the place down. She stated: "I was staying at their house. I got so excited and nervous and upset that I fainted. He locked the doors and it started then. He run down the steps and said, `I am going to burn the house down.' We were locked in, and the police then came."
Clarence Politte, plaintiff's eighteen year old son, testified:
"Q. I wish you would tell the court, in your own words, what occurred between your father and step mother. A. There was always an argument and after that a fight, and after that the jail, and then they went back together for awhile. * * * Usually when they started arguing or fighting, I went downstairs.
"Q. They usually got into a fight when they got an argument started? A. Sometimes they would and sometimes they didn't."
The witness further testified that he was present in the police court when defendant struck plaintiff. The witness stated: "After it was over they walked out to the door and she hit him and knocked his glasses off and over against a newspaper man." He further testified he had heard defendant curse plaintiff and call him vile names; *148 that he had seen defendant drink whisky and had seen her drunk.
Appellant seeks a reversal of the judgment on the ground that plaintiff failed to establish by a preponderance of the evidence any grounds for divorce, and failed to show that he was the innocent and injured party.
Plaintiff has based his case on a charge of indignities offered him by defendant which he claims rendered his condition in life intolerable. Acts which constitute such indignities within the meaning of the statute, Sec. 1514, R.S.Mo. 1939, Mo.R.S.A. § 1514, are those which amount to a species of mental or physical cruelty, or of injury accompanied by insult or hatred, and must be such as cannot be relieved by any exertions of the injured party. Indignities such as warrant the granting of a divorce must ordinarily amount to a continuous course of conduct. Thus, a single act or word, or occasional acts or words, will not suffice. The conduct complained of must also be such as to connote settled hate, manifest alienation and estrangement, and consist of unmerited contemptuous conduct, or words and acts of one spouse toward the other showing contempt, contumely, incivility or injury accompanied with insult and amounting to a species of mental cruelty. Hoffman v. Hoffman, Mo.App., 224 S.W.2d 554; Haushalter v. Haushalter, Mo.App., 197 S.W.2d 703.
By reason of the irreconcilable conflicts in the testimony in this case, a decision must depend largely upon the credibility of the witnesses and the weight to be given their testimony. The trial court, who had the parties and their witnesses before him, had a better opportunity to determine this issue than has this court. The rules of law governing appellate review in cases of this kind are well settled and not in dispute. Our duty is to review the evidence and, while giving due deference to the findings of the trial judge, nevertheless reach our own conclusions and render such judgment as the evidence in our opinion warrants. With this rule in mind, we have carefully read and considered the evidence in this record and have reached the conclusion that the plaintiff has, by a preponderance of the evidence, established facts which prove that he was the injured party and that he has not been guilty of such indignities as would preclude a decree in his favor.
Although plaintiff admits that he did strike defendant, we are convinced that he did this under extreme provocation, and that his actions in this respect do not show a continuous course of conduct connoting settled hate and ill will toward defendant. The proof of sudden acts of retaliation by a party seeking a divorce will not necessarily defeat the action where repeated acts of the defendant constituting grounds for divorce have been shown. Griesedieck v. Griesedieck, 56 Mo.App. 94; Weisheyer v. Weisheyer, Mo.App., 6 S.W.2d 989; Rowland v. Rowland, Mo.App., 227 S.W.2d 478. The rule applicable here is stated in the Rowland case, supra, as follows, 227 S.W.2d loc. cit. 484: "However it was not enough for plaintiff merely to prove that he was an injured party, but for him to be entitled to a divorce it was necessary for it to appear that he was at the same time an innocent party. Kistner v. Kistner, Mo.App. 89 S.W.2d 106; Jones v. Jones, Mo.App. 164 S.W.2d 158; Rusche v. Rusche, Mo.App. 200 S.W.2d 577. This does not mean that his conduct towards and his treatment of defendant need on all occasions have been letter-perfect and above all reproach, for if this were so, few divorces, if any, could ever be granted. Stevens v. Stevens, Mo.App. 158 S.W.2d 238; Jones v. Jones, 208 Mo.App. 632, 235 S.W. 481. On the contrary, the conduct of one party will not prevent him from being adjudged an innocent party unless his conduct was such as to entitle the other party prima facie to a divorce. Stevens v. Stevens, supra; Tebbe v. Tebbe, 223 Mo.App. 1106, 21 S.W.2d 915. It must be shown that he was guilty of a continuous course of conduct connoting settled hate and a manifestation of alienation and estrangement, and proof of mere occasional acts or words will not suffice. Hoffman v. Hoffman, Mo.App. 224 S.W.2d 554. Nor is a party to be denied a divorce to which the evidence shows that he is otherwise entitled if his occasional outbursts *149 and lack of complete control over his own actions are plainly induced by the wrongful conduct of the other party. Kolaks v. Kolaks, Mo.App., 75 S.W.2d 600."
We believe the trial court correctly decided the case at bar. The judgment is affirmed.
HUGHES and McCULLEN, JJ., concur.