

C_____, **Plaintiff-Appellant,**

v.

C_____, **Defendant-Respondent.**

**No. 33666.**

St. Louis Court of Appeals, Missouri.

Nov. 23, 1971.

Dempsey & Dempsey, Clayton, for plaintiff-appellant.

Donald L. Schmidt, P. Monti Kieffer, Schmidt & Kieffer, Clayton, for defendant-respondent.

WOLFE, Judge.

This is an action for divorce brought by plaintiff-appellant, the husband of defendant-respondent. Defendant filed a cross bill and in another count sought custody of the children of the marriage in the event no divorce was granted. The court denied a divorce on the petition and on the cross

bill but awarded custody to the defendant-respondent wife. The husband appellant asserts that the court erred in refusing to grant him a divorce and awarding custody of the children to his wife.

The evidence was that the parties were married on August 22, 1953. They were finally separated February 7, 1967. There were six children born of the marriage, ranging in age from a son thirteen years old and five daughters from the ages of twelve to two years. The hearing on the case started April 11, 1968, and continued intermittently until December 20, 1968. On July 30, 1969, the decree from which this appeal is taken was entered. The transcript before us consists of approximately 1500 pages and in addition there are numerous exhibits.

The evidence discloses the following facts. The plaintiff husband is a physician who has now a large and lucrative practice. The parties lived in St. Louis when they were first married and they later moved to Buffalo, New York, where the plaintiff interned. From there they moved to Jackson, Mississippi, where he was with the Public Health Service for two and one-half years. They then moved to Chicago where they resided for three and one-half years. Since the year 1962 they have lived in St. Louis. The home in which they lived was well appointed and in a good neighborhood.

The marriage of the parties was discordant almost from its inception but it became more so when they moved to Jackson, Mississippi, where the husband worked with the Public Health Service. There the defendant wife became critical of him and bragged about her sexual escapades with previous boy friends. At times she struck him and spit in his face. At one time she struck him with such force that she broke a metacarpal bone in her hand. She dug her nails in his wrist. She tried to kick him in the groin. She constantly threatened him with divorce and consulted a lawyer in Jackson, Mississippi. This was the first time she consulted a lawyer, but he was just the first of eight different lawyers she consulted at various times. She stated that her husband hit her when they were living in Jackson. He left the Public Health Service by reason of a disability diagnosed as angina pectoris and was retired at a sixty per cent disability because of this condition.

Moving from there to Chicago they bought a home and it required some finishing which they both engaged in doing with the assistance of the plaintiff's father who went to Chicago to help them. They then moved to St. Louis and the plaintiff set up an office in St. Louis County and one in Belleville. The wife helped him by answering the phone which had an extension to the home. She kept books for him and made out his income tax return. She ran the household and took the phone calls for her husband when his office was not attended. She had household help one or two days a week. She claimed that her husband beat her and that she had bruises on her arms and legs. He asserted that all he did was slap her when she spit in his face. She claimed that her husband threw a lamp at her. She screamed that she had grounds for divorce and ran from the house to a neighbor's where she called the police. She took the children from her house to her parents' home and she withdrew funds from a joint bank account. She refused admission of her husband to the house and when he tried to open the door it was locked by a chain to the molding on the inside and he pushed it and the molding came loose and the door opened. At this point she called her brother-in-law and he threatened to beat the husband and she called the police. There were no arrests and she filed suit for divorce. A short time after she called her husband by phone and said she had the "nesting instinct" and wanted to come home. She then came back with the children.

The defendant wife started taking Dexamyl which is a habit forming drug combining a barbiturate and an amphetamine. It

can be purchased only on prescription. The barbiturate causes stimulation, elation and euphoria which is followed by depression. In October of 1966 she asked him for a prescription for the drug, but he refused to write one for her stating that the last thing she needed was a stimulant. She secured the drug by forging her husband's name on the prescription blanks making out the prescription to other people and then getting them filled herself at different drugstores. She admitted forging the prescriptions and claimed she started taking the drug to reduce her weight, but increased the dosage prescribed as she continued to take it. The drug came in bottles of one hundred tablets and the plaintiff found as many as forty-seven tablets in her purse at one time.

The husband removed the throttle link from the car defendant drove so that it was inoperative after she had run into something while riding with the children and they all had cuts. In January, 1967, the plaintiff stated that his wife was absenting herself from home and coming in at very late hours with the smell of alcohol on her breath. He noticed her car parked in front of a night club. Thereafter he employed an investigator. It was discovered that the defendant was frequently in the company of a part-time musician. On February 7, the plaintiff told his wife he was going on a trip to New York. There was some doubt about flights to New York that day because of fog over New York City and the defendant wife telephoned the airport several times to find out if the flight east had been cancelled. When she was assured that it was not cancelled, she telephoned her paramour and asked him to come to the house. She assured him that the children would all be asleep and that her husband was en route to New York.

She had heavily drugged the six children with a sedative so that she would be undisturbed during her visit with the musician. While she was there with her visitor her husband came in with the investigator and a photographer. That brought to light the fact that she and her paramour had been dining together at various places and had sexual intercourse in an apartment available to them on three occasions and once on a trip into the country. She was taken from the home that night by the investigator to a motel and given some money. The children were so heavily drugged that the father had difficulty in awakening them.

Thereafter he sued for divorce and asked his wife to come to his lawyer's office. She stated that she was coerced into allowing her husband to obtain an uncontested divorce. This was denied by the husband and his lawyer. A decree was granted the husband but it was set aside and most of the evidence set out above was submitted in the trial that followed. In the interim between the first trial of divorce and the following hearings, she would visit the children and attempt to spend the night at the house. She claimed that her husband had intercourse with her. She said their arguments always ended with her husband "beating" her but she inadvertently mentioned exchanging blows. Their fights seemed to be centered on the husband's efforts to get her to leave the house after he arrived home from work. At one time she said the so-called beating occurred after the husband had been operated on for a herniated intervertebral disc and was wearing a back brace. One incident resulted in her getting a cut lip. The husband said she grabbed his thumb and was bending it back almost to the breaking point. He stated that when he grabbed her hand he assumed that her lip was cut by his wristwatch band as he found lipstick stains on his cuff.

The defendant had a book that she claimed to be a diary and in it she made notations of dates when she claimed her husband had intercourse with her during the period of separation. All of this was denied by the husband. Most of the husband's testimony as to her conduct was not denied, and the most offensive conduct such as the use of drugs, adultery and the forging of prescriptions to obtain drugs

was admitted. She also claimed that her husband at one time beat the children mercilessly, yet both of the older children testified that they preferred to live with their father.

The plaintiff husband testified that she threatened to take the drug prescriptions which she had forged to the Board of Medical Examiners and have his license revoked on the charge of peddling drugs and at that time, to protect himself, he took the forged prescriptions to the Prosecuting Attorney and a warrant was issued for the wife's arrest. Prosecution was later dropped.

A domestic relations worker testified that she thought the mother would be better able to provide a home environment for the children. When asked if she would make the same recommendation if she knew of the mother's admitted adultery and the drugging of the children she stated that she did not know of this and said, "Now you're getting me on thin ice," and she would have to consult her supervisor. She had consulted her supervisor about recommendations before making them.

Plaintiff husband employed a woman cousin to keep house for him and she was at home taking care of the children when he was at work. The defendant wife in her almost daily calls at the house berated the housekeeper before the children and one time deliberately closed a refrigerator door on the housekeeper's hand with such force as to break a finger bone. Psychiatric examination was made of both parties to this suit and the doctor Director of Clinical Research made a report which contains the following:

"[Her] performance on personality inventories such as the MMPI, the ICL, and the CPI, reflects that she tends to avoid subjective distress by engaging in continual activity. That is, to prevent experiencing anxiety or depression she tries to keep busy and avoid introspective efforts. When she is confronted with situations in which she cannot escape through continual activity, she exhibits little ability to deal with her emotional life in an organized and integrated manner. Instead, she tends to give vent to her feelings in a labile manner.

"[She] has relatively little commitment to abide by social standards. Two factors contribute to her relative disregard of social standards. First the degree to which she feels frustrated and gratified in her personal needs leads her to impulsively seek gratification in the most direct manner possible, even if this means violating social standards. Secondly she tends to attribute responsibility for errors to external sources. Thus she can easily rationalize any deviant behavior by claiming that 'others made me do it.'

"Projective material indicates that [she] is unrealistic in the expectations that she has in relationships with others. In an adolescent fashion, she has dreams of finding 'a true love' relationship in which she is cared for by others in a childishly dependent manner. The unrealistic nature of her expectations predisposes her to continual dissatisfaction and despair in relationships with others.

"As I understand the question regarding [her] competencies as a parent, you are primarily concerned in comparing her competencies to those of her husband. In this respect I would state that her overall level of adjustment is more significantly impaired by psychological conflicts than is her husband's overall adjustment. She thus has less energy that can effectively be committed to the role of motherhood than would be ideal. At the same time, her level of adjustment is not so seriously impaired that she could not care for the basic needs of her children."

As to the defendant husband he stated:

"[He] is strongly motivated to achieve through competitive efforts. Projective material is particularly laden with

themes of individuals besting others in achievement endeavors. Related to this characteristic is the difficulty that [he] finds in accepting weakness or errors in himself and others. One would anticipate that in resolving conflicts with his children, [he] would probably be relatively stubborn and unyielding when his beliefs were challenged. I would also anticipate that he would set high standards for achievement with his children and be impatient were these not met. In spite of these characteristics, I do not think that [his] psychological adjustment is as impaired by psychological conflicts as is his wife's adjustment. He, therefore, from a psychological standpoint, would be in a better position to assume responsibility for his children. However, this must be weighed against the fact that his work requires that he spend long hours away from the family."

The respondent states that in passing upon this appeal we must defer to the findings of the trial court in matters involving credibility of witnesses and the weight to be given their testimony. We had occasion to elaborate on this in Rusche v. Rusche, Mo.App., 200 S.W.2d 577, l. c. 580, wherein Judge Bennick stated for the court:

"We appreciate the basis for the rule of due deference in that character of litigation in which the scope of the appellate court's review embraces disputed issues of fact. However the rule does not mean that the appellate court must blindly accept the findings of the trial court, for if that were so, there would be but little occasion to appeal in an action for divorce or in any other type of case in which the rule of due deference would apply. On the contrary, the appellate court has the positive duty to try the case de novo and reach its own conclusion on the facts; and while it will be inclined to defer to the trial court's findings in instances where sharply conflicting evidence does not greatly preponderate one way or the other, such findings are in no sense binding upon the appellate court, and it will not hesitate to disregard them where its own consideration of the evidence impels the conclusion that such findings were erroneous."

Like statements will be found in Schwarz v. Schwarz, Mo.App., 427 S.W.2d 734; and Luckett v. Luckett, Mo.App., 263 S.W.2d 41.

■ We have set out all of the evidence that we deem pertinent to a disposition of this appeal. It leaves no doubt that the defendant was an adulterous, violent person addicted to drugs who forged prescriptions to obtain them, and that she heavily drugged her children on one known occasion so that she might engage in her lustful pursuit undisturbed by them. The recommendations of the domestic relations worker were on their face worthless. Defendant's conduct toward her husband doubtlessly caused him to react and she now claims that he is not the injured and innocent party. It is, of course, necessary that a party seeking a divorce must prove himself not only the injured but also the innocent party. But, as we stated in Politte v. Politte, Mo.App., 230 S.W.2d 142, l. c. 148:

"* * * This does not mean that his conduct towards and his treatment of defendant need on all occasions have been letter-perfect and above all reproach, for if this were so, few divorces, if any, could ever be granted. Stevens v. Stevens, Mo.App., 158 S.W.2d 238; Jones v. Jones, 208 Mo.App. 632, 235 S.W. 481. On the contrary, the conduct of one party will not prevent him from being adjudged an innocent party unless his conduct was such as to entitle the other party prima facie to a divorce. * * *

Nor is a party to be denied a divorce to which the evidence shows that he is otherwise entitled if his occasional outbursts and lack of complete control over his own actions are plainly induced by the wrongful conduct of the other party. Kolaks v. Kolaks, Mo.App., 75 S.W.2d 600."

We find from all of the foregoing that the court erred in denying a divorce to the appellant and in awarding custody of the children to the respondent. The judgment is reversed and the appellant is granted a divorce and custody of the children born of the marriage. The defendant-respondent is granted the right of visitation with the children at reasonable times.

BRADY, P. J., and DOWD, J., concur.